UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 05-61805(2) |
| DECKER COLLEGE, INC., | ) | Chapter 7 |
|     Debtor | ) | |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| ROBERT W. KEATS, TRUSTEE | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. 25-_ |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF EDUCATION | ) | |
|     Defendant | ) | |
| | ) | |
| LINDA MCMAHON in her official | ) | |
| Capacity as Secretary of the United States | ) | |
| Department of Education | ) | |
| | ) | |

## VERIFIED COMPLAINT

Comes Robert W. Keats ("Trustee" or "Plaintiff"), in his capacity as Trustee in

Bankruptcy for the Estate of Decker, Inc. d/b/a Decker College, Inc. ("Decker" or "Debtor"), and

by and through counsel, for his complaint against defendant, Linda McMahon, Secretary of the

United States Department of Education (the "Department" or "Defendant"), states as follows:

## PRELIMINARY STATEMENT

1.    Beginning in 2005, the Department began a campaign of subsequently disproven

allegations which led first to the suspension of critical federal funds required for Decker's

continued operation and then to Decker's involuntary bankruptcy.  Although Decker has

repeatedly prevailed in disputes related to the Department's allegations have in administrative

and legal tribunals over the course of nearly twenty years, its vindication came too late for many

who were adversely impacted by the Department's actions, including thousands of students and

hundreds of staff and faculty.  Since Decker's successes in demonstrating that the Department's actions were incorrect, which changed the state of play from an analysis of how much Decker owes the Department to an assessment of how much the  agency owes Decker, the Department has engaged in systematic efforts to block the payment of properly earned funds and delay accountability.

2.      The Plaintiff in this action is the Trustee for the Decker estate, who is pursuing all rights of action to seek redress for the financial hardship visited upon the school by the Department.

3.      By this lawsuit, the Trustee seeks compensatory and injunctive relief on behalf of the Decker estate that will allow him to finally – after 20 years and extensive efforts to try to collaborate with the Department – bring this matter to a close and provide some measure of relief to those damaged by the Department's abrupt and improper actions.

## PARTIES

4.      Plaintiff is the duly appointed Chapter 7 trustee of the Decker estate.

5.      Defendant is a federal agency which, among other things, is responsible for the administration of student financial aid programs under Title IV of the Higher Education Act, as amended, 20 U.S.C. § 1001, *et seq*. ("Title IV Programs" and "HEA").

## JURISDICTION AND VENUE

6.      On October 24, 2005, creditors filed with this Court an involuntary bankruptcy petition under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").  Decker consented to the order of relief on November 4, 2005.

7.      The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157.

8.      This action constitutes a core proceeding by virtue of 28 U.S.C. § 157(b)(2).

9.      Plaintiff consents to entry of final orders and judgments by the Court in this action.

10.     Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

11.     Venue is proper in this Court as to the Defendant because a substantial part of the events or omissions giving rise to the claims asserted herein against the Defendant occurred in this judicial district. At all times relevant, Decker maintained its main campus in Louisville, Kentucky, and also maintained an additional branch campus in Louisville during much of the relevant time period. A large number of students enrolled in Decker attended classes and/or resided in this district.

## GENERAL ALLEGATIONS

### A.      Decker's Launch of Construction Trades Programs After a Decade of Successful Operation and Participation in the Title IV Programs

12.     Decker was founded in 1989 in Louisville, Kentucky, with the mission of providing educational programs and vocational training designed to meet specific business and industry goals as well as the personal career goals of students.

13.     After attaining institutional accreditation with the Council for Occupational Education ("COE") in 1992, Decker applied to the Department for eligibility and certification to participate in the Title IV Programs, which the Department granted later that year.

14.     For the next decade, Decker focused on offering certificate and associate's degree programs in business and technology, which it offered at its campus in Louisville.

15.     In 2002, recognizing the construction industry's need for skilled craftsmen, Decker began developing several associate degree programs in Electrical Science, Carpentry Science, and HVAC Science (collectively, the "Construction Programs").  Decker designed the

3

Construction Programs to be offered through a "hybrid" delivery methodology, now widely accepted in higher education, in which part of the program was offered online and part at Decker's construction-focused instructional sites in Georgia, Florida, Indiana, and Kentucky. For the online components of the curriculum, internationally recognized distance education experts worked closely with Decker to develop online versions of the construction curricula created by the National Center for Construction Education and Research.

16.     In order for students enrolled in the Construction Programs to be eligible to receive federal student aid under the Title IV Programs, Decker began to work extensively with state oversight agencies and COE to secure approval of the programs. Accordingly, beginning in 2002, and on multiple occasions over the course of two years, Decker secured state approvals and engaged with COE to provide descriptions of the Construction Programs, including a face-to-face meeting with COE in September 2003 and a presentation to COE in March 2004. Finally, in April and May 2004, Decker submitted applications to COE for approval of the Construction Programs, and the Executive Director of COE, Gary Puckett ("Puckett"), sent letters to Decker in June 2004 confirming that COE had extended accreditation to all three.

17.     Decker subsequently began enrolling students in the Construction Programs, and a team of COE evaluators who visited Decker in August 2004 confirmed that it was offering the Construction Programs in a manner consistent with its approvals and with the self-study report it had submitted in advance of the visit, which disclosed the exact schedule and number of weeks of instruction that were provided online versus on-site.

18.     The Construction Programs proved to be in high demand. For the 2004-2005 federal student aid award year, Decker enrolled approximately 4,500 students in these and other programs, supported by hundreds of staff, faculty, and contractors. At that time, Decker's most

recent federal cohort default rate – a commonly cited metric calculated by the Department that speaks to student ability to repay federal loans following graduation and therefore program effectiveness - was only 2.7%, compared to 8.0% among similar institutions nationwide for the same period.

19.    As evidenced by a Goldman Sachs report prepared the first week of June 2005, comparable valuations of similar private educational institutions placed Decker's enterprise value at an estimated $462 million by the end of 2005.

**B.    The Department's Abrupt and Unreviewable Suspension of Title IV Program Funds to Decker**

20.    The Department's continuing approval to administer Title IV Program funds is a matter of life or death for institutions of higher education, including Decker when it was in operation. Institutions process and distribute funding on behalf of students and rely on payments of tuition and fees to cover the cost of instruction, facilities, faculty and staff salaries, student services, and all of the other functions required by accreditors and state regulators. In 2005, nearly all of Decker's students were eligible for some form of federal financial aid, which they relied on to finance their studies and related living expenses.

21    In January 2005, William F. Weld ("Weld") was appointed as Decker's Chief Executive Officer. In the 1980s, Mr. Weld had served as a U.S. Attorney in Massachusetts, where he investigated and successfully prosecuted Wilfred American Educational Corporation ("Wilfred") for fraud in the operation of its institutions, which were eventually forced to cease operations in 1994. Ralph LoBosco ("LoBosco") was a senior employee of Wilfred at the time of closing.

22.    As described in a declaration submitted in 2005 by a former Decker employee in connection with Decker's suit against COE, Mr. LoBosco told this employee that the change in

position caused by Wilfred's closure significantly impacted his and his wife's lifestyle. *Compass Educ. Holdings, Inc. v. Council on Occupational Educ., Inc.*, No. 1:05-cv-02645-JTC, (N.D. Ga. Oct. 13, 2005), ECF No. 5-4.

23.     Following the closing of Wilfred, LoBosco became employed by the Department's Office of Federal Student Aid ("FSA"), eventually becoming the Area Case Director responsible for leading the Kansas City regional office overseeing institutional compliance with Title IV Programs in several states. The Kansas City office led by LoBosco was responsible for overseeing compliance for schools in Kentucky, including Decker.

24.     In the first week of June 2005, the FSA Kansas City Case Team headed by Ralph LoBosco initiated a discretionary, unannounced, on-site program review at Decker's main campus in Louisville. The team included LoBosco's deputy, Dvak Corwin ("Corwin") who arrived with a team at Decker's premises to conduct an unannounced site visit.

25.     Following the team visit, LoBosco sent a letter to Weld on June 14, 2005 notifying him that, effective the previous day, the Department had changed the method by which Decker could access Title IV Program funding to Heightened Cash Monitoring 2 ("HCM2") as a result of FSA's program review.  Under the HCM2 payment method, an institution must disburse its own funds to students' accounts in advance of the receipt of Title IV Program funds, and then provide the Department with student records for which it seeks reimbursement of these advance disbursements. As described in the HCM2 instructions, the Department generally reviews a sample of up to 100 students from each HCM2 submission and approves the submission based on the sample.  Neither the imposition of HCM2 nor the Department's refusal to pay is subject to appeal under agency rules, and there is no mechanism to do so.

26.     The change in Decker's method of Title IV Program payment immediately

suspended the flow of funds it needed to satisfy tuition payments from its students and pay faculty, leases for instructional sites, student services staff, and all other expenses associated with offering educational programs. Instead of being able to draw down Title IV Program funds, Decker was required to advance its own funds to students to satisfy educational and living expenses that students were eligible to receive under the Title IV Programs as a prerequisite to seeking reimbursement from the Department for those payments. The Department assured Decker that it could apply for reimbursement of the Title IV Program funds after filing requests for repayment.

27.     Decker submitted its first reimbursement request in July 2005, but FSA rejected it for reasons that Decker later proved – in the Department's own administrative tribunal – were based on improper interpretations and applications of relevant regulations by Department staff. Specifically, FSA Institutional Program Reviewers Corwin directed Decker to revise and resubmit the substantial request, asserting that Decker had incorrectly calculated Pell Grants and unearned Title IV Program funds for students who had withdrawn. At the time, because Decker was in a position of extreme financial exigency and had no avenue of appealing the imposition of HCM2, it agreed to follow Corwin's recalculation instructions and reduce reimbursement amounts in an effort to keep the school open for students to complete their programs.

28.     Decker prepared two new reimbursement requests following FSA's since overruled guidance, which it submitted on August 10, 2005, and September 8, 2005. These two requests totaled approximately $11.5 million and were accompanied by eighteen boxes of supporting documentation.

###     C.    The Department's Allegation that Decker's Programs were Not Accredited

29.     Throughout September 2005, Decker continued corresponding with FSA

regarding the pending reimbursement requests.  Although Weld and others at Decker received

repeated confirmations from the Department's reimbursement specialists – notably, not LoBosco

or Corwin – that the claims were correctly calculated and that Decker could begin disbursements

as soon as senior-level approvals in the chain of command were granted, such approvals never

occurred, and financial challenges became critical as the Department refused to repay Decker for

properly advanced funds.

30.     On September 30, 2005, Weld received a letter from FSA denying Decker's

continued certification to participate in the Title IV Programs.  The letter alleged that COE had

not accredited the Construction Programs, stating, "Decker violated Title IV, HEA program

requirements when it awarded Title IV, HEA program funds for students in the AAS

[Construction] programs, and therefore the Department must deny Decker's recertification

application."  This determination came as a surprise to Decker, as neither Department nor COE

had notified Decker of LoBosco's conversations with Puckett, and Decker had no opportunity

prior to the Department's denial action to respond to COE's claim that the Construction

Programs were not accredited.

31.     Like the HCM2 action, the denial of recertification was not subject to any formal

appeal process with the Department before an administrative law judge or any other independent

designated official to stay the decision or review the rationale.

32.     Decker later learned through litigation and Freedom of Information Act requests

that, around June 2005, LoBosco had begun to make repeated inquiries to, and requests of, COE

regarding Decker, its accreditation status, and the extent of the online portion of the Construction

Programs. COE is a non-governmental organization that relies on dues paid by member

institutions to retain accreditation. This accreditation allows COE members to be eligible to

receive Title IV Program funds on behalf of enrolled students as long as COE retains recognition by the Department, which it must periodically renew. Unbeknownst to Decker, Lobosco frequently corresponded with Puckett about Decker, emailing him news articles regarding Weld.

33.    LoBosco also simultaneously contacted Department colleague John Barth ("Barth"), Director of the Department's Accreditation and State Liaison Office, the division of the Department responsible for overseeing the actions of accreditors recognized by the agency regarding the scope of COE's own recognition by the Department to accredit online programs. At the time of these contacts, COE had recently filed its own Petition for Continued Recognition by the Department as a nationally recognized agency under 20 U.S.C. § 1099b, which included a request to expand the existing scope of COE's recognition by the Department regarding programs taught primarily online. Barth's office was responsible for reviewing COE and recommending a course of action to the Secretary for continued approval as a "gatekeeper" of federal financial aid.

34.    Continued recognition was key to COE's operations and ongoing access to Title IV Program funds for the hundreds of colleges COE accredited at the time, including those that also relied on the distance education delivery methodology used by Decker. If COE lost recognition by the Department, all schools would have been required to apply for accreditation by another recognized accrediting agency or risk losing access to Title IV Program funds for thousands of enrolled students. COE was entirely dependent on a combination of membership and user fees from currently accredited and prospective member institutions.

35.    LoBosco made sure to inform COE that he had contacted Barth, and Puckett sent an apparently unsolicited letter to the Department staff member responsible for reviewing COE's application for continued recognition to claim that COE had not approved the Construction

Programs to be offered via distance education, to explain that LoBosco had notified him regarding his "concerns" about Decker, and to claim that, based on LoBosco's report, COE was taking steps to ensure that Decker corrected its "violations."  Despite the Department's repeated discussions regarding COE's accreditation of Decker, neither COE nor the Department contacted Decker about the issue until much later in the process.

36.     In a subsequent case filed against the COE related to these interactions with the Department denying that the agency had approved Decker to offer the Construction Programs in a hybrid format, two different tribunals found that these COE statement were factually erroneous (See section X below). *Keats v. Council on Occupational Educ., Inc. (In re Decker College, Inc.)*, Ch. 7 Case No. 05-61805, Adv. No. 09-3091, at 18-19 (Bankr. W.D. Ky. July 10, 2012), ECF No. 198.

**D.     Decker's Closure and Involuntary Bankruptcy Following Seizure of Its Records**

37.     On October 21, 2005, the Federal Bureau of Investigation ("FBI") seized Decker's physical and electronic records in connection with an investigation conducted jointly with the Department's Office of Inspector General ("OIG"), but no criminal indictments or convictions, civil liabilities, or other findings of wrongdoing ever resulted from this investigation.   This seizure was unannounced, and Decker never learned the reasons for it. The FBI did not return the seized records until 2009.

38.     Without the records necessary to continue to process Title IV Program funding and respond to the Department's inquiries, Decker closed its doors that same day and did not reopen.

39.     On October 24, 2005, creditors filed an involuntary bankruptcy petition in the Court, forcing Decker into bankruptcy.  The bar date for filing proofs of claim in the Bankruptcy

case was set for April 10, 2006 (the "Bar Date").

40.    Robert W. Keats was appointed as Trustee on November 4, 2005.

**E.    The Department's Imposition of a $32 Million Liability on Decker Based on Findings Later Shown to be Improper**

41.    On March 31, 2006, the Department issued a Final Program Review Determination ("FPRD"), the final statement of findings and proposed liabilities stemming from the program review that FSA initiated in June 2005 and the report was provided well after the Decker closure.  FSA typically issues a preliminary program review report and allows the institution a chance to respond before liabilities are assessed, but no such opportunity was provided to Decker prior to the denial of recertification.  The FPRD is attached hereto as **Exhibit A**.

42.    In the FPRD, the Department asserted total liability in the amount of $32,109,646, of which $31,595,885 was based on a finding (Finding 1) that Title IV Program funds awarded to students enrolled in the Construction Programs were improper because those programs had not been accredited by COE to be offered in a distance education format.

43.    Finding 2 alleged that Decker miscalculated the amount of Title IV funds that should have been returned to the Department due to student withdrawals.

44.    In Findings 3, 4, and 5, the Department asserted that Decker's programs were considered "non-term," and therefore, Decker had allegedly disbursed loan and grant funds to students who did not qualify based on the relevant regulatory parameters for non-term programs.

45.    Finding 6 – which did not carry any liability or rest on any independent basis, but was based entirely on the preceding findings – claimed that Findings 1 through 5 "indicate[d] that Decker lacked the administrative capability to administer the Title IV, HEA programs properly."

**F.      The Department Denies Decker's Pending HCM2 Reimbursement Requests**

46.      On the same day that the Department issued the FPRD, the Department also sent Decker a letter denying its longstanding HCM2 reimbursement requests.  The Department identified the primary reason for the disallowance as the alleged ineligibility of Decker's Construction Programs due to their lack of COE accreditation.  The other two cited reasons for denial were Decker's alleged liabilities outlined in the FPRD and Decker's failure to submit a close-out audit, which was impossible because the FBI and the Department's OIG had confiscated nearly all of Decker's physical and electronic records five months earlier in October 2005. At the time of the notice of the denial of the request for reimbursement, the FBI had not returned Decker's records and they were not returned until 2009.

**G.      The Department's Filing of a Proof of Claim Based Solely on the FPRD and Draw on Decker's Letters of Credit**

47.      Likely believing that findings against a closed institution would not be challenged, the Department filed an unsecured proof of claim with the Bankruptcy Court a few days prior to the April 10, 2006, bar date.  *See* Claim No. 557-1 (the "POC").  This POC was based solely on the liabilities asserted in the first five FPRD findings and did not include any potential interest claims or other contingent or unliquidated liabilities.  The POC is attached hereto as **Exhibit B**.

48.      On April 10, 2006, the Department also drew down letters of credit that Decker had posted in connection with routine financial reviews which it claimed were for refunds, closed school discharges, and other liabilities, without providing any accounting for these funds. The Department still has not returned those funds or provide any accounting for the use of the proceeds.

12

H.    **Decker's Lengthy Battles to Reverse the Department's FPRD Findings**

49.    Upon receiving the FPRD, Decker promptly filed a request for review in an administrative proceeding under Subpart H of Title 34, Part 668, of the Code of Federal Regulations.  In Subpart H proceedings, an administrative law judge (ALJ) or other designated official in the Department's Office of Hearings and Appeals ("OHA") is responsible for reviewing the institution's and FSA's written submissions and hear oral arguments, issuing a decision regarding whether the FPRD is supportable, in whole or in part.  None of the other actions taken by the Department, including the imposition of HCM2 and the denial of recertification, were eligible for adjudication by an OHA ALJ or by the OHA.

50.    In accordance with the OHA briefing schedule, Decker filed briefs and documentation in 2007 and 2008 supporting its position that the Construction Programs were accredited by COE, leaving no basis for the entirety of Finding 1, and also arguing that the remaining findings were invalid because the Department's interpretations of its regulations were incorrect as applied to Decker's programs.

51.    Regarding Finding 1, FSA argued in response that only COE or a court could change COE's letter to the Department asserting that it had not accredited Decker's Construction Programs.

52.    Because of FSA's insistence, Decker initiated a judicial proceeding to determine whether COE's statements to the Department were false, filing suit against COE in this Court on December 15, 2009.  The ALJ stayed the administrative proceeding until Decker could obtain a finding of fact in an adversary proceeding against COE regarding whether COE's statements to the Department were factually erroneous.

53.    In March 2012, this Court conducted a four-day evidentiary hearing.  Following

the hearing, this Court issued Findings of Fact confirming that COE's statements to the Department were "false" and "factually erroneous." *Keats v. Council on Occupational Educ., Inc. (In re Decker College, Inc.)*, Ch. 7 Case No. 05-61805, Adv. No. 09-3091, at 18-19 (Bankr. W.D. Ky. July 10, 2012), ECF No. 198.12.

54.     COE appealed these Findings of Fact to the U.S. District Court in August 2012. Following a de novo review, the District Court affirmed this Court's decision and stated, "[t]he Bankruptcy Court reasonably found COE to be dishonest when it told the Department it did not approve the Hybrid Programs to be offered in this manner." *Keats v. Council on Occupational Educ., Inc.*, No. 3:12-mc-00018-JGH, 2012 WL 6084646, at *6 (W.D. Ky. Dec. 6, 2012).

55.     In January 2013, COE then appealed to the Sixth Circuit, which dismissed the appeal for lack of subject matter jurisdiction later that year, allowing the District Court's ruling to stand. *Council on Occupational Educ., Inc. v. Keats (In re Decker College, Inc.)*, 578 F. App'x 579, 582 (6th Cir. 2014). Decker ultimately reached a monetary settlement with COE regarding its incorrect claims that it had not accredited Decker's programs.

56.     Following the Sixth's Circuit's dismissal of COE's appeal, Decker then turned its attention back to the Department administrative proceeding, five years after it had been paused due to FSA's insistence that a judicial tribunal needed to resolve the foundational question of whether COE's statements to the Department were false. This insistence to seek further litigation following the Bankruptcy and Circuit Decisions lead to the further delay of Decker's ability to pursue its claims against the Department.

**I.      The ALJ's and Secretary's Agreement with Decker and Elimination of Nearly All Liability**

57.     Despite all the effort and expense Decker had undertaken over the course of five

14

years to satisfy FSA's request to resolve the validity of COE's denial of accreditation, FSA then stunningly attempted to block the administrative proceeding from resuming. The ALJ rejected FSA's attempt and, after another round of briefings, issued a decision in March 2016 – nearly 10 years to the day after the Department issued the FPRD – rejecting nearly all of FSA's arguments and assessments of liability.  Decker College, U.S. Dep't of Educ., No. 06-22-SP (Mar. 15, 2016) (as later affirmed, the "ALJ Decision").  The ALJ Decision is attached hereto as **Exhibit C**.

58.    First, the ALJ determined that "the statements made in COE's letter to FSA were false, and that COE had accredited Decker for its program, including the distance education components."  He also criticized FSA's attempt to further delay Decker's case, noting that "[t]here is a  point at which a delay in the hearing process becomes a constitutional violation of Decker's right  to procedural due process."  This conclusion eliminated the $31,595,885 liability that FSA had  asserted against Decker for Finding 1.

59    The ALJ also found that FSA improperly alleged that Decker's methodology for determining the withdrawal dates of students it used in calculations for refunds to the Title IV Programs "inflated" the amount Decker could retain.   Specifically, the ALJ determined that, under relevant regulatory language, FSA was incorrect that the withdrawal date had to be based on the student's initiation of contact rather than Decker's.  For Findings 3, 4, and 5, the ALJ rejected FSA's argument that Decker made disbursements of loan and grant funds to students before it was authorized and also rejected FSA's claim that Decker had miscalculated the appropriate disbursement of Pell Grant funds, proving that Corwin's advice regarding the initial HCM2 reimbursement requests was incorrect as Decker originally claimed.  The ALJ sided with Decker's interpretations of the Department's regulations in every instance and only upheld a portion of liability under Findings 3 and 4, which was a liability Decker had already conceded.

The ALJ also accepted Decker's argument that any conceded liability under Finding 3 should be subject to the estimated loss formula using Decker's aforementioned very low official cohort default rate of 2.7% rather than the FSA-advocated rate of 65.0%.

60.     Finding 5 liability was completely eliminated as well, and the ALJ effectually reprimanded FSA for its attempt to go beyond the language of the regulations with respect to their application to Decker, stating, "As an Administrative Judge, I cannot waive, ignore or invalidate the applicable regulations. . . . The regulations are clear and I must follow them."

61.     Finding 6 was not subject to appeal because it did not involve an independent monetary liability.

62.     FSA appealed the ALJ's decision with respect to Findings 1 and 2 to the Secretary of the Department (the most senior agency official), who in November 2016 also rejected every one of FSA's arguments and affirmed the ALJ's decision on all fronts.  Decker College, U.S. Dep't of Educ., No. 06-22-SP (Nov. 2, 2016).   The Secretary's decision is attached hereto as **Exhibit D**.

63.     The Secretary repeatedly emphasized that he was "unpersuaded" by FSA and confirmed that the ALJ properly concluded that Finding 1 was "factually unsupported," while Finding 2 was unsupported by the Department's regulations.

64.     Accordingly, a decade after the FPRD was issued, the ALJ and Secretary confirmed that Decker was correct, despite bearing the heavier burden at each stage of the process.  However, because the Department's administrative appeal process only adjudicates Title IV funds due to the Department, it did not resolve the amounts due to Decker or the process by which Decker could seek payment of the long overdue HCM2 requests previously denied based on now overturned claims.  No such review process for payments due to an institution

exists.

J.    **After Losing in Its Own Administrative Proceedings, the Department's  Unsuccessful Attempt to Introduce New Liabilities**

65.    Because the Department's POC was based solely on the FPRD liabilities, which were almost entirely overturned in the administrative proceeding, the Department realized that the circumstances had significantly changed and, in early 2017, attempted to bootstrap new claims onto an amended POC in Bankruptcy Court – even though the sole purpose of the amendment should have been to reduce the original liability amount as specifically directed by the ALJ and affirmed by the Secretary.

66.    These new claims included approximately $6.7 million purportedly arising from the Department's discharge of student loans made to Decker's students after the agency unilaterally chose to forgive the obligations and forced Decker to close.  The Department also included a new claim for interest in connection with the FPRD liabilities.  The Department could have asserted these as contingent or unliquidated liabilities in its 2006 POC, but chose not to do so.

67.    The Honorable Thomas H. Fulton, U.S.B.J., flatly rejected this attempt by the Department to prejudice other creditors, disallowing the Department from amending its proof of claim eleven years later to "assert any claims that were not originally and expressly asserted in the FPRD."   While permitting the Department to amend its proof of claim to reflect recalculation of liabilities expressly asserted in the FPRD, as ordered by the Secretary, Judge Fulton went so far as to say that allowing the attempted amendment on other grounds would be "manifestly unjust."  Order Denying Motion to Amend Proof of Claim in Part and Granting it in Part at 1-2, *In re Decker College, Inc.*, No. 05-61805 (Bankr. W.D. Ky. Mar. 31, 2017), ECF No. 599 (the "Amendment Order").  The Amendment Order is attached hereto as **Exhibit E**.

68.     In accordance with Judge Fulton's ruling, and based on the passage of the proof of claim bar date for governmental claims, the Department was not permitted to assert any affirmative claims against Decker that were not included in its original POC filed by the bar date in April 2006.

69.     Following Judge Fulton's order, Decker asked the Department to provide justification for the liability amounts included in its amended proof of claim.  Instead of providing Decker with documentation showing that it had reduced the $442,286 Pell Grant liability for Finding 2 in accordance with the ALJ Decision, the Department's supporting documentation asserted Pell Grant liability for the same finding was now $611,244, with no explanation for the substantial increase.

**K.     The Department's Efforts to Cite Incorrect and New Interpretations of Applicable Requirements to Deny Relief to Creditors of the Decker Estate**

70.     Following Decker's successes in litigating against COE and prevailing in judicial and administrative proceedings against FSA over the course of a decade, the Trustee was finally able  to begin the process of reassembling previously seized files and preparing reimbursement requests aligned with the ALJ's and Secretary's  decisions.

71.     Toward this end, in fall 2017, Decker hired a vendor to begin scanning the 900+ boxes of records that the FBI had seized in 2005 and returned in 2009 to a storage locker located in the outskirts of Louisville in various states of disarray.  In spring 2018, Decker hired an experienced accounting firm that specializes in  Title IV and regularly prepares HCM2 requests, Weworski & Associates ("Weworski"), to  prepare student files in support of a reimbursement request to the Department.

72.     On behalf of Decker, Weworski submitted a batch of fifty student records for the

Department to review in advance of a formal request for reimbursement, because preparation of a comprehensive submission for all outstanding amounts was cost prohibitive for Decker, and there is no requirement that an institution submit all requests for reimbursement at the same time. The Department offered to review these files as a "courtesy" to Decker and help guide the subsequent submissions. These fifty files were submitted to the Department via the U.S. Department of Justice ("DOJ") on December 18, 2018. On May 29, 2019, Weworski submitted another set of files on behalf of Decker due to the delay in the review of the original 50 that was consistent with the Department's directions in its June 2005 HCM2 letter and the subsequent ALJ and Secretary decisions, accompanied by a formal request for reimbursement of approximately $3.6 million.

73.     The normal processing time for typically much larger reimbursement requests is approximately thirty days. Nevertheless, more than six years after Decker's initial fifty-file submission and subsequent request for $3.6 million, the Department has remitted zero dollars to Decker. Decker and its counsel and the Department and the DOJ have exchanged letters and emails, and even met in person and in conference calls on numerous occasions to try to remedy the shifting grounds for denial, but have made no progress other than to confirm that they have reached an impasse.

74.     The Department attempted to justify the refusal to pay amounts due by making unreasonable demands based on regulations that did not exist at the time Decker was in operation and on incorrect interpretations of applicable requirements. Furthermore, the Department also raised new issues to avoid repayment that were not previously identified in any of the Department's many action letters issued in 2005 and early 2006, even though the agency should have raised these issues years ago instead of nearly twenty years after Decker's closure. As

previously noted, there is no agency process to appeal the Department's refusal to pay or to adjudicate the numerous incorrect grounds for such refusal. Without access to such independent review, a familiar process has repeatedly occurred over the years: the Department repeatedly raises an unsupportable critique to deny reimbursement, Decker explains why the basis is incorrect, and then the agency creates another perceived defect or ignores its own standards that invalidate its position.

75.     For example, the Department previously raised the catch-all category of "administrative capability" as a bar to repayment, but it already exhausted its opportunity to support this position in 2006, when it based its finding of lack of administrative capability in Finding 6 of the FPRD solely on Findings 1 through 5 and was soundly defeated as a result of Decker's appeal. The Department has even gone so far as to question whether Decker was offering eligible programs and to claim this is a reason why it will not fulfill the reimbursement requests – despite the fact that this is the very issue Decker has spent the last twenty years successfully confirming.

76.     In 2018, the Department issued a new, more stringent set of HCM2 reimbursement request submission instructions to replace the ones issued to Decker in 2005 and applied them retroactively. The Department then demanded that Decker submit a single consolidated request for all Title IV funds requested, despite the absence of an obligation to do so anywhere in the Department's procedures and in contrast to the standard processing of reimbursement requests from open institutions. Further deviating from normal process, the Department then refused to process the initial submission of fifty files as a formal submission, claiming that this would somehow skew the statistical validity of future requests. It also asserted that it could not process the separate $3.6 million request because review of the initial fifty

student files remained in process. At every turn, the Department has attempted to find new reasons not to pay amounts due the Estate.

77.     In the course of its review of Decker's reimbursement requests, the Department has also asserted requirements that did not exist at the time Decker was in operation. For instance, the Department demanded that Decker show how its award of academic credit in 2004 and 2005 aligned with current regulatory definitions of a credit hour, despite the fact that no credit hour rules or similar federal requirements related to measurement of academic activity existed at the time Decker was offering educational the Construction Programs and were not introduced until 2010.

78.     Also in the course of its review of the first fifty files in Decker's December 2018 filing, the Department asserted that Decker needs to demonstrate that there were graduates from the Construction Programs, even though it cannot point to single regulatory requirement or any guidance document that establishes some number of graduates as an eligibility requirement for degree programs. If the Department consistently applied this position to all institutions, no student could ever receive funding for a program until a sufficient number of students graduated from a new program potentially four years after initial enrollment, an absurd position that is easily and consistently countered by decades of agency practice. At every turn, the Department has attempted to find new reasons not to repay amounts due to the estate.

79.     Within the last several years, the Department has also raised Decker's lack of "financial responsibility" as a bar to reimbursement of Title IV funds, but the regulatory scheme identified at 34 C.F.R. § 668.175(d) expressly allows institutions not meeting the financial responsibility standards to continue participating in Title IV Programs by posting a letter of credit. In fact, Decker previously posted such letters of credit while open and hundreds of

institutions participate in Title IV Programs on this basis every year. As previously noted, the Department seized those prior letters of credit without explanation and has not returned the proceeds.

80.     In 2019, Decker sought and received approval from this Court to hire an accounting firm experienced in auditing institutions participating in Title IV Programs, Almich & Associates ("Almich"), to again attempt to complete a close-out audit that would facilitate repayment of funds and eliminate yet another or the Department's efforts to delay payment.  A close-out audit assesses the administration of Title IV funds and has nothing to do with the financial position of the audited entity or amounts owed to it.  However, the Department subsequently insisted that it also would also require the accounting firm to perform financial statement audits covering several years prior to Decker's closure,  including the reconstruction of audits it previously accepted without question in 2004. Furthermore, the Department is seeking certain regulatory calculations for the same periods, which Almich and Weworski – two of the preeminent accounting firms for colleges and  universities – confirmed is an abnormal request with respect to a closed school, not typically within the scope of any close-out audit, and likely impossible due to the passage of time, condition of files, and lack of access to all relevant personnel.

81.     In the years that preceded these financial statement requests, the Department has never requested revised financial statements, a new financial statement, or any financial calculations, and in fact already issued a  letter prior to Decker's closure stating that it had completed its review of Decker's financial records for part of the period now in question.

82.     These unreasonable and evolving obstacles to repayment, and recent unfruitful attempts to reach a settlement through mediation, have made clear to Decker that the continued

pursuit of reimbursement through representatives of the agency offers little hope of relief without external intervention and supervision.  Decker's efforts to obtain rightfully earned funds, provide relief to creditors, and finally resolve the affairs of the estate have been repeatedly met with delays, roadblocks, incorrect interpretations, new assessments of liability, and assertions that the Department can unilaterally determine if and when it repays amounts due to Decker.

      **L.**    **The Department's Violation of the Automatic Stay and Amendment Order By Attempting to Impose New Liabilities Nearly Nineteen Years after the Bar Date, and After This Court Previously Denied a Request to Amend the POC**

83.     On November 16, 2020, the Department *sua sponte* issued a Final Audit Determination (the "Determination") in proceedings under Audit Control Number 04-2005-52005 (the "Audit Proceedings").  The Determination is attached hereto as **Exhibit F**.

84.     The Determination states that Decker was required to complete a close-out audit for July 1, 2004 to September 30, 2005 within 90 days of October 5, 2005, but failed to do so – but conveniently fails to mention that the FBI and the Department's OIG had custody of the records necessary to conduct such an audit within that 90-day time frame and for years following.  The Determination then concludes that Decker's failure to submit the close-out audit "constitutes a failure to account for all Title IV, HEA program funds received by [Decker]" during that time period and that Decker "is liable for all Title IV funds received during the unaudited period."  This is despite the fact that the Department already reviewed hundreds of student files for the exact same time period, which was the basis for the FPRD that was later overturned.

85.     The Department claims that it held its "final accounting" on the close-out audit in abeyance during "the pending administrative hearing in Docket No. 06-22-SP, and to accommodate subsequent settlement discussions that were inclusive."

86.     The Determination asserted new liabilities in the Determination that Decker is allegedly liable for another $23,540,804.54 from July 1, 2004 through September 30, 2005.

| Program | Principal Amount Due | Cost of Funds | Total Due | Included in FPRD/POC? |
|---|---|---|---|---|
| Pell Grants | $14,256,418.00 | $2,151,957.83 | $16,408,375.83 | No |
| Loans (FFELP) | $16,881,977.00 | | $170,634.52 | No |
| Loans (Direct) | $1,376,439.00 | | $44,299.19 | No |
| Student Loan Discharges Granted by the Department as a Result of Decker Closure | $6,896,759.00 | | $6,896,759.00 | No |
| 2004-2005 Excess Cash DL Funds | | | $20,736.00 | No |

87.     As set forth in the above chart, over $23 million in alleged liabilities were not included in the FPRD, or by extension in the POC, and the Department is barred from asserting them as set forth in the Amendment Order.

88.     The Department could have asserted these liabilities years ago, prior to filing the POC and at a time in which Decker would have been able to address, but for the continuous delay tactics and secrecy regarding communications with COE.  However, the Department chose not to, instead relying entirely on the liabilities asserted in the FPRD, which were later almost completely eliminated by its own ALJ and affirmed by its Secretary, the most senior agency official.  The Department's calculations of liability amounts based on estimated loss are also

directly contrary to the ALJ Decision.  Specifically, the ALJ  determined that the cohort default rate applicable to asserted liabilities involving estimated loss  is Decker's actual most recent official cohort default rate of 2.7%, a point explicitly briefed and adjudicated by the ALJ. Consistent with prior agency interactions, the Department simply  disregards the ALJ's ruling and instead claims Decker has no default rate and imposes the 2017 sector cohort default rate of 18.0% (again, more than 10 years after closure) to assess a liability. As a result, the Department assessed a liability nearly 10 times the actual amount, even if such an  assessment could be permitted at this late date, which it cannot.

89.     Although the Department stated that it would not seek to collect on these liabilities because Decker is in bankruptcy, it nonetheless included detailed payment instructions and warned that the "debt may also be referred to the Department of the Treasury for further action as authorized by the Debt Collection Improvement Act of 1996 in accordance with federal law."

90.     The Department also reserves the right to "recover liabilities either existing now, but unknown to the Department, or accruing in the future, through offset or other collection efforts in accordance with federal law."

91.     The Determination required Decker to file any administrative appeal within 45 days of its issuance. The last time Decker filed an administrative appeal it prevailed, but the Department's process took more than a decade to complete, and the Department's presentation of this option was  yet another example of the Department using delay as a strategy to avoid repayment.

92.     Separate from its determination on the liabilities that Decker allegedly owes the Department, the Determination also notes in passing that while it "received payment requests

from Decker in August 2005, September 2005, and in May 2019, those requests failed to demonstrate that Decker was entitled to reimbursement of Title IV funds." The Department provides no explanation of the reasons why such requests were deficient, and there is no established administrative process to appeal a decision of the Department to deny repayment of funds.

93      The Department's reference to the reimbursement requests in the Determination is the first acknowledgment since the ALJ Decision, albeit in dicta, that the Department has issued any form of determination that it will not reimburse any funds owed to Decker, despite years of leading Decker to believe that it would review and fulfill Decker's reimbursement requests in good faith.

94.     Consistent with this Court's instruction, Decker again engaged in the Department's administrative appeal process to appeal the latest Determination in December 2020. After briefing on the matter, the ALJ issued a ruling upholding the Pell liability for $16,408,375.83 due to the lack of a closeout audit and an additional $20,736.00 related to handling of excess funds during the same period. However, the ALJ also disallowed the $6,896,759.00 related to closed school discharges and loan costs $214,933.71 during the unaudited period. A copy of the ALJ decision is included as **Exhibit G**.

95.     Both parties appealed the decision to the Secretary of the Department in August 2021. Nearly three years later, on June 7, 2024, Miguel A. Cardona, Secretary of the U.S. Department of Education issued a decision affirming the decision of the ALJ. A copy of that decision is included as **Exhibit G**.

96.     The Department has now exhausted its opportunities to place additional roadblocks in the way of accounting for funds due to the Estate.

97.     As a direct and proximate result of the Department's errors, the school has calculated the amount of receivables and other payments that should have been promptly paid but were not paid by the Department when due Decker beginning in 2005, excluding interest and other delayed amounts, in a sum of money exceeding $36,000,000.00.

## COUNT I

### (Turnover Under 11 U.S.C. § 542)

98.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

99.     Decisions made in proceedings against the various entities regulating Decker found that interactions encouraged by the Department were found to be factually erroneous, and caused the improper closure of Decker. Such improper conduct resulted in the closure of the institution, seizure of Decker's student and business records, and prevented Decker from receiving reimbursement for properly disbursed funds.

100.     The Bankruptcy Code requires that "an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee." 11 U.S.C. § 542(b).

101.     In June 2005, the Department began withholding student financial aid funding, requiring Decker to disburse its own funds to students' accounts prior to receiving reimbursement from the Department.

102.     The Department never granted any of Decker's reimbursement requests, claiming alleged violations prevented payment.

103.     The Department's ALJ and Secretary subsequently overturned the Department's cited rationale for denying reimbursement.

104.     The Department has repeatedly created obstacles to repayment by claiming new requirements applicable only to Decker, retroactively imposing obligations implemented after Decker's forced closure, and extending administrative and judicial disputes for nearly 20 years.

105.     The withheld funds accordingly constitute a debt owed by the government to the Trustee, for which the Trustee has repeatedly demanded payment.

106.     None of this debt has been paid to the Trustee.

107.     The Department has repeatedly attempted to increase amounts it claims are owed to the agency well after the POC only to be rejected in administrative and legal proceedings.

108.     To the extent there is any dispute over these reimbursements, the Department consented to this Court's jurisdiction to decide such disputes by, among other conduct, filing the POC.

## COUNT II

### (Procedural Due Process)

109.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.

110.     The Fourteenth Amendment prohibits state actors from depriving of liberty or property without due process of law.

111.     Decker's receipt of student financial aid funds under Title IV constitutes a liberty and property interest.

112.     The Department has violated Plaintiff's due process rights by effectively terminating Decker's right to receive Title IV funds without notice or an opportunity to be heard, resulting in Decker's closure.

113.     The Department has therefore unlawfully deprived Plaintiff of procedural due

process guaranteed by the Fourteenth Amendment and protected by 42 U.S.C. § 1983, causing

harm to Plaintiff.

114.    The Trustee is entitled to nominal damages, actual damages, and punitive

damages.

## COUNT III

### (Objection to Claim Under 11 U.S.C. § 502)

115.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if

fully set forth herein.

116.    The Determination may constitute an informal proof of claim.

117.    The Determination was asserted after the Bar Date and asserts claims that the

Court held were not allowable in the Amendment Order.

118.    The Determination is not enforceable because the claims the Department seeks to

assert are time-barred.

119.    The Determination also seeks interest that accrued after the Petition Date, in

violation of section 502(b)(2) of the Bankruptcy Code.

120.    The Court should disallow and expunge any claim based on the Determination, to

the extent it constitutes an informal proof of claim or an improper attempt to amend the

Department's POC.

121.    The Trustee reserves the right to raise additional specific objections to the

Determination.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks for judgment:

1)      Ordering that the Department return all funds owed to Plaintiff under Count I;

2)      Awarding Plaintiff damages under Counts I and II in an amount to be determined at trial, including compensatory, actual, nominal, and consequential damages, as well as pre-judgment and postjudgment interest;

3)      Awarding Plaintiff punitive damages under Count II in an amount to be determined at trial; and

4)      Granting such other and further relief as the Court deems just and equitable.

Dated: March 4, 2025                    Respectfully submitted,

*/s/ Robert W. Keats*
Robert W. Keats, Trustee
P.O. Box 221377
Louisville, Kentucky 40252-1377
(502) 558-6339
rkeats@bellsouth.net

**<u>VERIFICATION</u>**

I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

Dated: March 4, 2025

*/s/ Robert W. Keats*
Robert W. Keats
*Trustee, Estate of Decker College*

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the foregoing was served via electronic mail to all parties receiving service through the Court's ECF system, and to the following list on March 4, 2025.

<u>/s/ *Robert W. Keats*</u>
Robert W. Keats

United States Department of Education
Serve: Linda McMahon, Secretary
400 Maryland Ave., SW
Washington, DC 20202

Attorney General of the United States
Main Justice Building
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. Department of Education
Office of General Counsel
400 Maryland Ave., SW
Room 6E300
Washington, DC 20202-2111

Office of the U.S. Attorney
For: United States Department of Education
717 West Broadway
Louisville, KY 40202

*For general information purposes:*
Federal Student Aid Union Center Plaza
830 First Street, NE., 7th Floor
Washington, DC 20202

**<u>EXHIBIT LIST</u>**

Exhibit A. Final Program Review Determination (Mar. 31, 2006)

Exhibit B. Proof of Claim # 557-1 (Apr. 3, 2006)

Exhibit C. Decision in FSA Appeal (Mar. 15, 2016)

Exhibit D. Secretary's Decision (Nov. 2, 2016)

Exhibit E. Order denying Department's Proof of Claim (Mar. 31, 2017)

Exhibit F. Department's Final Audit Determination letter (Nov. 16, 2020)

Exhibit G. Secretary's Decision (Jun. 7, 2024)