# EXHIBIT C



**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

---

In the Matter of

**DECKER COLLEGE,**

Respondent

---

**Docket No. 06-22-SP**

Federal Student Aid Proceeding

PRCN: 200530724584

Appearances: David E. Mills, Esq., Joseph J. Vaughan, Esq., Cooley LLP, Washington, DC, and Peter D. Coffman, Esq., Thompson Hine, for Decker College;

Steven Finley, Esq., Office of General Counsel, U.S. Department of Education, Washington, DC, for FSA.

Before: Robert G. Layton, Administrative Judge

**DECISION**

Decker College (Decker) was a private, two-year career educational institution headquartered in Louisville, Kentucky with locations in Atlanta, GA, Indianapolis, IN, and Jacksonville, FL. Decker participated in the federal student aid programs authorized under Title IV of the Higher Education Act of 1965 (Title IV). 20 U.S.C. § 1070 *et seq.*; 42 U.S.C. § 2751 *et seq.* The Office of Federal Student Aid (FSA) of the United States Department of Education (Department) administers these programs. Decker appealed from a Final Program Review Determination (FPRD) that the FSA issued on March 31, 2006, under which the FSA assessed and sought to recover liabilities of $32,109,646. Because Decker was in bankruptcy, however, the FPRD did not provide repayment instructions for the liability.

The findings contained in FSA's FPRD were for (1) Ineligible/Unapproved Programs; (2) Return of Funds Not Documented/Not Paid; (3) FFEL Disbursement Attributed to Unattended/Incorrect Payment Periods; (4) Improper Disbursement – Federal Pell Grant Disbursed Prior to Midpoint; (5) Incorrect Federal Pell Grant Calculation for Institution Without Fixed Terms, and (6) Lack of Administrative Capability.[1] I will discuss each of the appealed findings separately.

---

[1] Finding 6 imposed no monetary liability, and the parties agree it is therefore not within the review jurisdiction of this appeal.

On October 15, 2010, the originally designated hearing official, Honorable Richard I. Slippen granted the joint motion of the parties to stay this proceeding. Judge Slippen retired, and ultimately, on January 28, 2015, this appeal request by Decker College was reassigned to me. By order issued on February 11, 2015, the previous stay in this matter was lifted, and briefing schedules were set for the parties. An explanation of the procedural history is required to explain why the stay was entered and why it was recently lifted.

**FINDING 1**

Finding 1 imposed a liability of $31,595,885 on Decker, and is the source of what has been described as a "procedural quagmire." [2] The liability was based on the finding that Decker offered courses under the Title IV HEA program funding which FSA asserts were unapproved under Decker's accreditation from the Council on Occupational Education (COE). If unaccredited, Decker's courses would not be legally authorized for Title IV funding. The basis of FSA's finding was an August 23, 2005 letter by COE informing FSA that Decker was not accredited to provide programs delivered primarily through distance education. Although that August 23, 2005 letter triggered a significant change from monthly prepayment of Title IV funds to Decker, Finding 1 was part of a FPRD Letter that wasn't issued until March 31, 2006. FSA and Decker agree that the sole basis for the Finding 1 liability was the letter from COE to FSA.[3] COE is not a party to this action, but Decker contested the COE letter, first through this appeal, then in federal court and ultimately in Bankruptcy Court, where COE was made a party. In an October 15, 2010 joint motion to stay this appeal, Decker and FSA stated:

> "Both Decker and FSA believe that the final resolution of the COE litigation (in bankruptcy court) would likely have a material impact on Finding No. 1 and may eliminate the need for the Tribunal to rule on the various issues raised by the parties as to Finding No. 1, as well as the other findings to the extent that they are based on Finding No. 1."

Decker and FSA agreed that a stay was necessary for this proceeding in order to allow the assigned bankruptcy judge[4] to conduct a hearing and rule on a single question: Was the accrediting agency COE's letter to FSA true or false?

Decker and COE[5] agreed to have the Bankruptcy Court judge conduct "a hearing on the veracity of COE'S statements" to FSA. In 2012, after a four-day evidentiary hearing, the Bankruptcy Court found the key statement in the COE letter to FSA was "factually erroneous." The Bankruptcy Court's finding was affirmed on appeal by the U.S. District Court, Western District of Kentucky and the U.S. Court of Appeals for the Sixth Circuit dismissed for lack of jurisdiction.

---

[2] Honorable U.S. District Court Judge John Heyburn II, *Exhibit R-44, 3.*

[3] The remaining findings were identified by FSA during a June 6, 2005 program review of Decker.

[4] Honorable U.S. Bankruptcy Judge Thomas H. Fulton, Western District of Kentucky.

[5] FSA was not a party in the bankruptcy action, although they joined in the request in this action to have the Bankruptcy Court judge conduct the hearing concerning COE's letter.

After the bankruptcy appeals were addressed, on February 11, 2015, the parties in this appeal were ordered to report whether the stay should remain in place. FSA's response was unchanged--FSA quoted COE, which still disagreed with the Bankruptcy Court's finding. Because of COE's statement, FSA supported a continuation of the stay but did not factually dispute the Bankruptcy Court's finding. Decker responded that the purpose of the stay had been satisfied, and that both Decker and COE consented to the limited bankruptcy hearing on the accuracy of the COE's letter to FSA.

The stay in this proceeding was lifted on February 11, 2015. In the order lifting the stay, the parties were informed that this appeal would take official notice of the Bankruptcy Court's decision entered on July 10, 2012. *In re Decker College, Inc.*, No. 05-61805, 2012 WL 6136708 (Bankr. S.D. Ky. 2012); *see* 34 C.F.R. § 668.118(c).

**THE BANKRUPTCY COURT'S FINDING THAT COE'S LETTER WAS "FACTUALLY ERRONEOUS"**

The U.S. Bankruptcy Court, Western District of Kentucky Judge Thomas H. Fulton noted the existence of this administrative action, stating: "Plaintiff has appealed the Department's revocation of certain funding through the Department's administrative appeal process. *The Department, however, has stayed those proceedings so that this Court may make the within findings, which will be used by the Department in its proceedings." Exhibit R-43,2, (emphasis added).*

The Bankruptcy Court found the critical letter from COE on August 23, 2005 (informing FSA that COE did not approve Decker's programs to be delivered primarily through distance education) was factually erroneous. The Bankruptcy Court determined that COE had approved Decker's programs but later erroneously informed FSA that it had not.

On appeal, the U.S. District Court noted that "the merits of COE's accreditation were not on trial. The Bankruptcy Court did not evaluate whether COE should have approved the programs with distance learning but rather whether the programs were in fact approved and consequently whether COE's statements to the Department were false." *Exhibit R-44, 11.* The District Court specifically affirmed the Bankruptcy Court's findings that COE's statement to the Department was "factually erroneous."[6]

Although FSA argues the Bankruptcy Court and this Tribunal seek to review the COE decision on accreditation, the Bankruptcy Court finding is not a determination that COE erred in its decision on accreditation. It determined that COE had in fact accredited Decker's program,

[6] Decker contends the Bankruptcy Court and the District Court entered a formal finding that COE's statement was "dishonest". While Hon. U.S. District Court Judge John Heyburn II did use the word dishonest in a descriptive section, his order was that the "Bankruptcy Court's Findings of Fact are AFFIRMED". *Exhibit R-44, 13.* The Bankruptcy Court had a narrow and factually specific determination that the statement was "factually erroneous", which is not a finding of dishonesty. The bankruptcy judge noted in his findings that "The Court is *not* charged at this time with determining COE's *intent* in making such statements." *Exhibit R-43,3.*

including its distance education, and that COE's letter stating Decker was unaccredited was factually erroneous. That determination was made after hearing days of evidence and voluminous testimony. Furthermore, the decision carefully articulated which evidence was most probative. Specifically, at numerous places in Decker's application for accreditation, Decker provided written information that its program included distance education. COE's witness admitted she reviewed that written information. COE's approval letter accrediting Decker for the period was expressly "based on the applications" submitted by Decker. "Given that [Decker's] application disclosed [Decker's] intention to offer the Programs through distance education, the Approval Letters' reference to the applications implicitly authorized Decker to do so." *Exhibit R-43, 12.* Further, COE sent inspection teams to Decker's campuses whose handwritten notes include class names with the notation "Dist. Ed" at the bottom of the form. The inspectors also spoke with at least four staff members from Decker whose job titles included either "Dist. Ed" or "Distance Learning". The judge found it "incredible" that COE's inspectors would not have at least asked about the reference to distance education in the Decker staff members' job titles. *Exhibit R-43, 16.* The judge's decision was supported by numerous other findings, all of which demonstrated that Decker expressly informed COE of its distance learning program. Finally, a witness for Decker testified that he and a COE representative attended a meeting in 2005. The judge found the Decker witness' testimony credible that he and the COE representative were seated at a "small table" with U.S. Congressman John A. Boehner, and that Decker's distance learning was discussed in glowing terms during that conversation. The only responsive testimony from the COE representative was that he simply did not remember such a discussion. The judge found that lack of recollection "somewhat incredible" given the detail of the testimony by Decker's witness. *Exhibit R-43, 18.*

The above evidence supported the Bankruptcy Court's finding that the accrediting agency was informed of the distance learning component through multiple sections of Decker's accreditation application, which COE subsequently approved expressly "based on the applications." The information in the applications, the information provided during campus inspections, the information provided to Kentucky regulators and to COE, and the "small table" meeting all supported the Bankruptcy Court's finding that COE's letter informing FSA that Decker was not accredited was "factually erroneous," and that Decker had been properly accredited during the period at issue in this appeal. *Exhibit R-43, 18.*

## SIGNIFICANCE OF THE BANKRUPTCY COURT'S DETERMINATION THAT COE'S LETTER WAS "FACTUALLY ERRONEOUS"

FSA has not submitted any evidence or arguments beyond COE's letter to support or address the real question of this appeal: Did Decker factually qualify for accreditation under the then-existing regulation? The letter is the only evidence relied on or submitted by FSA. It did not provide any independent evidence on that underlying question, and does not indicate any history of independent investigation or independently ascertained facts on Decker's accreditation. Although in other actions FSA has factually looked to the underlying facts on an accrediting agency's decision, in this action, FSA has not provided any independent factual basis relating to Decker's underlying program characteristics that Decker was not able to qualify for accreditation.

With such a very significant amount of liability at issue and such significant results flowing from Finding 1, it is troubling that FSA relied exclusively on this letter as a scant basis for imposing a $31 million liability, and that FSA chose not to conduct any examination of the facts and circumstances behind the letter from COE. Despite that fact, if there is any valid liability from FSA's Finding 1, it must result from the letter provided by COE saying Decker was unaccredited. If that letter is false, then FSA has no remaining basis for imposition of liability. The only appropriate and available remedy in this administrative proceeding is to affirm or reject the liability for Finding 1, based on the evidence provided and the burden of proof.

Under the appeal process set forth in 34 C.F.R. § 668.117, the hearing official is responsible for the regulation of the proceedings. This duty includes expediting the proceedings and setting times for submission of briefs. Under 34 C.F.R. § 668.118, the hearing official must base the decision only on evidence properly presented, on matters given official notice, or on facts stipulated to by the parties. Because of that authority, and since the parties expressly agreed on the Bankruptcy Court's role in determining if the accreditation letter was factually erroneous, I am taking official notice of the Bankruptcy Court proceedings.

The Bankruptcy Court's finding on the narrow issue of the factual accuracy of the letter was well reasoned and strongly supported by numerous evidentiary sources. It was also adopted by the U.S. District Court. However, despite the fact that this appeal to the Office of Hearings and Appeals has been stayed for years at the request of the parties to allow the Bankruptcy Court to proceed on the issue of the letter's validity, the ultimate decision in this appeal cannot be controlled solely by the Bankruptcy Court's finding.

The reason the Bankruptcy Court's finding is not absolutely controlling is that there is no dispositive issue preclusion or claim preclusion raised by the finding. The parties in this appeal did not agree that the Bankruptcy Court's finding would be controlling in this matter. Instead, the parties stated that the Bankruptcy Court finding "would <u>likely have a material impact on Finding No. 1</u> and <u>may</u> eliminate the need for the Tribunal to rule on the various issues raised by the parties as to Finding No. 1." (emphasis added). Because of this agreed-upon scope, the Bankruptcy Court's finding is very significant, but not absolutely dispositive, in this administrative appeal.

The final program review determination by FSA for Finding 1 stated that because Decker wasn't accredited, Title IV HEA program funds were improperly disbursed to students enrolled in Decker's classes. FSA found Decker liable for $31,595,885 in funds that would have been inappropriately disbursed to students if Decker was not accredited. This administrative appeal proceeding was initiated when Decker filed a written request for review of this liability assessment pursuant to 34 C.F.R. § 668.113. Subpart H places the initial burden of proof on Decker to show that it complied with program requirements. *Id.* § 668.116(d)(2).

As noted above, because of the significance both parties assigned to the Bankruptcy Court's decision, pursuant to the above-referenced regulations, I informed the parties in this proceeding that official notice would be taken of the Bankruptcy Court's decision. The parties were directed to state and provide support for their positions on the effect the Bankruptcy

Court's finding that COE's letter was factually erroneous should have on this proceeding. The order also required the parties to attach all exhibits to be offered in evidence and to identify any other evidence they believe supports a particular decision on the findings. The reason the parties were ordered to provide any other evidence is that the Bankruptcy Court proceeding was not necessarily dispositive, and the parties were to submit any other evidence on the underlying question of whether Decker qualified for accreditation under the regulations in existence at the time. Neither party submitted additional evidence, thus the focus for Finding 1 remained exclusively on the Bankruptcy Court's finding that the COE letter was factually erroneous.

Decker's brief points out that FSA's Finding 1 is based solely on COE's letter to FSA stating Decker was not accredited for distance education. FSA previously stated in this appeal that the Bankruptcy Court, where COE was a party, was the mandatory forum for proceeding with a determination on the factual accuracy of COE's letter. FSA also agreed that the Bankruptcy Court's findings on the factual accuracy of COE's letter should be used in the Department's administrative proceeding. FSA Status Report at 1, 3.

In its response brief, FSA now raises two arguments. First, FSA argues that COE's decision on accreditation is not subject to challenge in this appeal, and second, FSA argues the decision of the Bankruptcy Court is not final.

FSA's first argument does not apply. FSA is correct that this appeal is not authorized to review accreditation decisions. However, the context in which that rule of non-reviewability of accreditation decisions is entirely different than the present circumstances. The issue of accrediting agencies decisions as an express criteria for Title IV program eligibility have been presented in a proceeding to terminate an institution's eligibility to participate in the Title IV funding program. This appeal is from a Final Program Review Determination, which sought to impose a $31 million liability based on Decker being ineligible for Title IV. The Department has never suggested that such decisions on Title IV refund liability (as opposed to eligibility to continue participation in the Title IV funding program) must be the exclusive province of the accrediting agency; in fact, the Department has steadfastly asserted the opposite of its position here. It has always exercised the right to examine whether an institution meets Title IV eligibility requirements in the context of audits and assessments of liability.

Moreover, even if this were a termination of Title IV program participation, it must be noted that the COE letter would not be dispositive. In this appeal, there is not a presented question or argument that COE's decision on accreditation must be set aside. In this appeal, it has been established that COE's decision on accreditation in fact was to approve Decker, and that COE's subsequent letter to the contrary is factually erroneous.

Neither the Bankruptcy Court nor this appeal are reviewing the propriety of an accreditation decision. Rather, the Bankruptcy Court and I find that COE in fact accredited Decker for its programs, including the distance learning, and that its letter to FSA stating Decker was not accredited is factually erroneous.

FSA's second argument uses a procedural quirk to make the "quagmire" continue forever. COE chose not to certify the claim under Civil Rule 54(b) or seek permissive

interlocutory appeal under 28 U.S.C. § 158(d)(2) or 28 U.S.C. § 1292. As a result, COE chose not to make the Bankruptcy Court's ruling on the accuracy of the letter appealable.[7] Because of that decision by COE, the appeal of the letter ruling is on hold until all of the bankruptcy case's issues are litigated. However, the Bankruptcy Court judge has previously noted the remaining claim in the bankruptcy case cannot be resolved until after this administrative claim is addressed. Under FSA's argument, there would be a permanent bar to either proceeding, since both forums would be required to wait on the other to proceed. COE, who is not a party to this proceeding, cannot be allowed to forever freeze this action because it chose to not make the federal court ruling appealable.

A permanent stay to the administrative judicial process also raises constitutional issues. While reviewing courts give broad latitude to administrative bodies on the timeframe required to fully adjudicate an administrative claim, no court has ever approved a permanent bar to a decision. The letter at issue in Finding 1 is over 10 years old. This decision rejects FSA's contention that this decision must in effect be held in abeyance forever. There is a point at which a delay in the hearing process becomes a constitutional violation of Decker's right to procedural due process.

The Supreme Court noted in *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985), "The Due Process Clause requires provision of a hearing 'at a meaningful time.' *E.g., Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). At some point, a delay … would become a constitutional violation."

In summary, Finding 1 is based solely on COE's letter stating Decker was not accredited. The Bankruptcy Court found that statement to be false. Having taken official notice of the Bankruptcy Court findings, based on those findings and based on the same evidence that Decker also submitted separately to support this appeal, I find that the statements made in COE's letter to FSA were false, and that COE had accredited Decker for its program, including the distance learning components. I find that Decker has met its initial burden of proof under 34 C.F.R. § 668.116(d)(2) to show it complied with the program requirements at issue in Finding 1. At the time it initially relied on COE's letter saying Decker was unaccredited, FSA did not appear to have the benefit of the compelling evidence later generated in Bankruptcy Court showing that letter was in error.

FSA's Finding 1 is not supported by any separate underlying determination by FSA on whether Decker failed to meet the criteria for online or distance education. Therefore, I set aside Finding 1 and the related liability for Decker of $31,595,885.

There are additional liability findings which have bases that are separate from the Finding 1 liabilities which remain to be addressed in this appeal which I examine below.

[7] The U.S. 6th Circuit Court of Appeals dismissed COE's appeal for lack of subject matter jurisdiction, stating "there was neither any request for nor grant of either a 54(b) or § 1292(b) certification in the district court. Because the district court's decision was not certified to us for interlocutory review, we lack jurisdiction to decide this on a non-final basis." *In re Decker College, Inc.*, 578 Fed.Appx. 579, 582 (2014).

**FINDING 2**

In Finding 2, FSA alleges that Decker failed to return Title IV funds to the Department for students who withdrew from the institution prior to completing their program. FSA also claims that Decker used the incorrect date for determining when some students withdrew from the program. Specifically, FSA asserts that Decker improperly recorded students as officially withdrawing from the school on the date that Decker contacted the student over the phone rather than using another approved method. FSA argues that these withdrawal dates allowed students to reach the 60% threshold in order to earn all Title IV funds for that period. As a result, FSA demands the return of $3,291,759, an amount purportedly representing all unearned Title IV funds Decker has not paid back to the Department. Of that amount, FSA identifies $513,761 that is not duplicative of the liabilities asserted in Finding 1, which, if valid, would be a liability imposed despite my determination that the liability in Finding 1 must be set aside.

Decker recorded a student's withdrawal date as either: (1) unofficial: the date the student last logged into a class or the date the student last participated in an academically-related activity, or (2) official: the date identified by the student when they provided official notice to the institution based on a telephone conversation with the Registrar. The date the student last logged into a class or participated in an academically-related activity was used only for students Decker was unable to contact. For students Decker was able to reach over the phone, Decker determined the official withdrawal date based on information provided by the student and categorized this as the student's "“official” withdrawal under 34 C.F.R. § 668.22(c)(l)(ii). FSA's argument is that Decker utilized the date of the telephone contact as the withdrawal date, thereby improperly inflating or extending the students dates of attendance.

Department regulations require that when an institution discovers that a student has stopped attending, the institution must determine the amount of Title IV funds that the student earned and return the unearned amount within 30 days of the date the institution determined that the student withdrew. 34 C.F.R. § 668.22(a) (2003). An institution that is not required to take attendance must determine withdrawal dates no later than 30 days after the earliest of the payment period, academic year, or educational program from which the student withdrew. *Id.* § 668.22(c). The student's official withdrawal date can be either the date the student begins the withdrawal process prescribed by the institution or the date the student provides official notification to the institution. *Id.* §§ 668.22(c)(l)(i)-(ii). The student's unofficial withdrawal date can be either the mid-point of the payment period or the student's last date of attendance at an academically-related activity provided that the activity is academically-related and documents the student's attendance. *Id.* § 668.22(c). The refund determination is made pursuant to a calculation commonly referred to as the return of Title IV funds (R2T4). The amount of Title IV funds earned is based on the amount of time the student spent in academic attendance.

In response to the program review, FSA required Decker to identify and provide accounting for all unpaid refunds. Decker identified over 2,600 students who withdrew, either officially or unofficially who had received funds from the Department for the relevant award

years. Decker submitted worksheets to FSA reviewers who then used information from each of Decker's worksheets to create a new spreadsheet with a summary of liabilities for each finding in the FPRD. In addition, Decker was required to determine the withdrawal date for students who unofficially withdrew from the distance education, construction trade AAS degree program. FSA reviewers, however, contended Decker was inflating the official withdrawal dates used in its R2T4 calculations for these students. Specifically, FSA determined that Decker called students who had already stopped taking classes, thus suggesting they had unofficially withdrawn from their program, and recorded the date of the telephone call as the date the student officially notified Decker of his or her withdrawal. FSA asserts that because Decker was waiting to contact some students after the 60 percent point in the students' enrollment period, Decker recorded that these students had earned all Title IV funds for that period, therefore significantly overstating the Title IV funds students actually earned.

Decker insists that it calculated its students' earned and unearned Title IV funds correctly and that it prepared its spreadsheets based on FSA directives. The Registrar's Office, as the point of contact for students who wished to withdraw, was responsible for contacting students who had failed to log into the school's online system within a given period of time.[8] The Registrar would record the information that students gave over the phone onto contact logs.

Decker says that in the logs, the withdrawal date was the date provided by the student and the date of determination was the date the telephone conversation took place. Decker argues that this is consistent with 34 C.F.R. § 668.22(c)(5)(i) that defines "Official notification to the institution" as a "notice of intent to withdraw that a student provides to an office designated by the institution." Decker insists that it did not deliberately wait to contact students in order to pass the 60 percent point of enrollment so that its students could earn all Title IV funds for the period. Decker explains that for students it was unable to reach over the phone, the date of withdrawal was determined to be the date that the student last logged in to their class or the last date the student participated in another academically-related activity pursuant to 34 C.F.R. § 668.22(c)(3).

FSA points out that Decker officials acknowledged that the institution failed to return unearned Title IV funds, as required by federal regulations, when students withdrew from Decker prior to completing the payment period in which they were enrolled. For a student to officially withdraw, FSA asserts that *the student* must initiate the contact and, therefore, the phone conversations Decker initiated with students could not serve as the date of official withdrawal. Accordingly, FSA asserts that by using the phone conversation as the withdrawal date for students, Decker significantly overstated the amount of Title IV funds the student actually earned because those calls were often made significantly later than the

[8] For students in online classes, Decker's student handbook requires students to log-in at least weekly in order to establish that they are an active student.

student's last day of attendance.[9] If that assertion by FSA were true, then the Finding 2 liability would be upheld.[10]

As in all 34 C.F.R. § 668, Subpart H proceedings, Decker bears the burden of proving that it complied with all program requirements and that all expenditures were proper. *Id.* § 668.116(d). Decker is subject to the highest standard of care and diligence in administering Title IV programs and must account to the Department for all funds received under those programs. *Id.* § 668.82. The governing regulations at 34 C.F.R. § 668.22 require that a properly calculated return of Title IV funds be performed when a student withdraws, drops out, is expelled, or otherwise fails to complete a payment period or period of enrollment. *In the Matter of University of Cincinnati,* Dkt. No. 11-34-SP, U.S. Dep't of Educ. (Aug. 30, 2011).

In this instance, FSA's argument is supported by the evidence for some, but not all of the assessed liability. Decker certainly has liability beyond that relating to the telephone calls, and has not met its burden. For those students, the liability is simply an unpaid obligation that Decker has never met. For the liabilities relating to the telephone calls, however, Decker responded to FSA's assessment by submitting several individual spreadsheets relating to different parts of the FSA's unified spreadsheet for Finding 2. Decker argues the spreadsheets show FSA's argument on improper date of withdrawal determination is not supported by the evidence.

In response to the evidence in FSA's unified spreadsheet, Decker submitted individual spreadsheets titled spreadsheets A, B, C, D, E and Z. For the students identified on spreadsheets A and B, which are a significant portion of the students, Decker has met its burden. The spreadsheets A and B do not contain any evidence consistent with FSA's argument that the dates were extended. In fact, the few errors on those spreadsheets came from Decker short-changing itself on the date calculation by undercounting days of attendance.

Therefore, for spreadsheets A and B, I find that Decker's counting of attendance complies with the program requirements and properly calculates the return of Title IV funds.

However, for the remainder of the students in the other spreadsheets, Decker has failed to meet its burden. For a large number of spreadsheet C's records, which are offered to show proper dates of withdrawal, Decker instead has records with many fields that are completely blank, and lacking any dates or information to support its date of

---

[9] Also, FSA points out that the Registrar may withdraw an online student at Decker after missing more than 25 days of class. FSA argues that Decker could also use this practice to inflate the amount of earned Title IV funds.

[10] FSA notes that, even if the finding related to the telephone calls were not upheld, Decker still has a substantial repayment liability based upon its own calculations during the program review.

determination[11]. For spreadsheets D, E and Z, despite multiple opportunities, Decker did not submit responsive evidence in the form of spreadsheets with sufficient documentation to be able to be matched up to the unified FSA spreadsheet. Decker therefore has failed to meet its burden on those students identified on spreadsheets C, D, E and Z.

In conclusion, I find that Decker has met its burden of proof for the students whose withdrawal dates were determined by their last login or last participation in academically-related activities, and that Decker has also met its burden for the students documented in spreadsheets A and B. The evidence shows that for those students, Decker did not extend withdrawal dates by using telephone contact dates as argued by FSA. I therefore order FSA to reduce the original Finding 2 liability of $3,291,759 by removing the liability amounts imposed pertaining to those students in spreadsheets A and B, and I order Decker be held liable for that reduced amount.

## FINDINGS 3, 4, AND 5

In Findings 3, 4, and 5, FSA assessed liabilities upon Decker for allegedly dispersing the second payment of FFEL and Pell Grant Funds to students before it was authorized, in Findings 3 and 4 respectively, and miscalculating the disbursement of Pell Grant funds, in Finding 5. Specifically, in Finding 3 of the FPRD, FSA asserts a liability of $2,290,904 based on Decker dispersing the second payment of FFEL loan payments to students who did not complete both the first 15 weeks and 18 credits of the 36 credit program that was administered over the course of 30 weeks as required. Similarly, in Finding 4, FSA asserts a liability of $1,350,650 against Decker for dispersing the second Pell Grant payments to students who did not complete both the first 15 weeks and 18 credits. Finally, in Finding 5, FSA asserts a liability of $905,507 against Decker for dispersing Pell Grant funds without using the calculations required by 34 C.F.R. § 690.63(a)(4), for "programs not using terms or using clock hours."

Decker has conceded that it owes liability under Findings 3 and 4 for any students who received FFEL loan or Pell Grant payments prior to the completion of the fifteenth week who did not then continue on after the fifteenth week. The dispute at issue in Findings 3 and 4, then, is whether Decker is liable for funds dispersed to students who had completed 15 weeks of the program but had not completed 18 credits of work in Findings 3 and 4. Additionally, the parties dispute the liability owed in Finding 5 -- whether Decker was required to calculate Pell Grant fund disbursement based upon the formula used for programs that do not use terms. Reviewing the relevant statutes and regulations, it is clear from the plain language that Decker does not owe the entirety of the liabilities that FSA assessed in Findings 3, 4, and 5.

34 C.F.R. § 668.4 establishes the general standards for determining the payment periods for programs under the HEA. Under the regulation, Decker's disbursements of the second payments of FFEL and Pell Grant funds for the AAS construction program were proper when made after the completion of the fifteenth week of the term.

[11] The Finding 2 liability was spread over several geographically separate locations for Decker, and was separated out into the various spreadsheets.

The applicable version of 34 C.F.R. § 668.4 divided programs into three categories:

I. First, for "an eligible program that measures progress in credit hours and *has academic terms* . . . the payment period is the academic term." 34 C.F.R. § 668.4(a) (2005) (emphasis added).

II. Second, for "an eligible program that measures progress in credit hours and *does not have academic terms*," where the program is one academic year or less in length, the second payment should be made only after the student "completes half the number of credit hours in the program *and* half the number of weeks in the program."[12] 34 C.F.R. § 668.4(b) (2005) (emphasis added).

III. And, third, for "an eligible program that *measures progress in clock hours*," where the program is one academic year or less in length, the second payment should be made after the student "completes half the number of clock hours in the program." 34 C.F.R. § 668.4(c) (2005).

The parties agree that Decker's program consisted of a 30-week and 36-credit term. Because Decker's program had a term, and was measured in credit hours, not clock hours, its payment period would be measured by the academic term, not by credits, and disbursement after the halfway point in the calendar was proper. Moreover, the specific regulations governing the payment periods under FFEL programs and Pell Grant programs dictate that it was proper for Decker to disburse funds after the fifteenth week.

The timeline for disbursing FFEL loans at issue in Finding 3 is currently governed by 34 C.F.R. § 682.603 and 34 C.F.R. § 682.604. Because Decker does not fit into the exception for a school that either does not use terms or does not use terms that are substantially equal in length, the regulations dictated that Decker could make the second delivery of the FFEL funds once it reached "the calendar midpoint between the first and last scheduled days of class of the loan period. 34 C.F.R. § 682.604(c)(6) (2005) and 34 C.F.R. § 682.604(c)(7) (2005). Therefore, Decker does not owe a liability in Finding 3 for FFEL loans disbursed after the completion of week 15.

For Findings 3 and 4, I find Decker is not liable for funds dispersed to students who completed 15 weeks of the program but had not completed 18 credits of work.

Finally, 34 C.F.R. § 690.63(f) indicates that Decker does not owe the liability assessed in Finding 4. The regulations provide that when disbursing Pell Grants, an institution "may not disburse an amount that exceeds 50 percent of the student's annual award until the student has completed the period of time in the payment period that equals, in terms of weeks of instructional time, 50 percent of the weeks of instructional time in the program's academic year." Because of this, for Decker's thirty week program, Decker does not need to return a second disbursement made after the fifteenth week of the program as assessed in Finding 4.

[12] For a program that last more than one academic year, the rules are slightly different, but that issue is not before the Tribunal in this matter.

As noted above, in Finding 5, FSA required Decker to return funds because it failed to calculate Pell Grants using the formulas required under 34 C.F.R. § 690.63(a)(4). 34 C.F.R. § 690.63(a)(4), by its terms, is to be used for "programs not using terms or using clock hours." Because Decker's program had an established term and Decker used credits not clock hours, Decker was under no obligation to use the calculations required by 34 C.F.R. § 690.63(a)(4). For Finding 5, I find no liability, because Decker's program had an established term using credits and not clock hours.

FSA argues that because a predominant portion of the class can be completed on-line, and notin the classroom, I should treat the course as if there was no established term. The regulations differentiate based upon the existence of substantially similar length terms and the use of credit hours rather than clock hours. No distinction is made in the language of the regulations for different treatment for a program such as Decker's, which has established and substantially consistent terms and which uses credits rather than clock hours, because the program provides for students to complete their studies online during the established term. As an Administrative Judge, I cannot waive, ignore or invalidate the applicable regulations. 34 C.F.R. § 668.117(d). The regulations are clear and I must follow them. I do not have the authority to add to the regulations; rather, I have a duty to "follow the regulations as they are written." *In re CUNY*, Dkt. No. 93-3-O, Department of Education (March 30, 1994).

**Estimated Loss Formula for Finding 3**

For the liability that remains in Finding 3, the Parties dispute how the amount Decker owes should be calculated. Initially, the Parties disputed whether the use of the estimated loss formula, sometimes called the actual loss formula,[13] was appropriate. From their most recent filings, however, it appears that neither Party opposes the use of the formula, but rather the Parties now only dispute the cohort default rate used when applying the estimated loss formula to calculate the amount of money Decker must return for liabilities remaining in Finding 3.[14]

"[C]ohort default rates consistently have been relied upon in this [T]ribunal's past decisions as an equitable component of estimated actual loss," and absent a reason, we do not "depart from the ED's consistent practice of using cohort default rate to determine loss."[15] We have traditionally calculated the estimated loss under the formula by multiplying an institution's cohort default rate by "the total amount of ineligible loans disbursed during a given award year to yield an estimated expenditure of defaulted loans," and then "this estimate is added to

[13] *See In re Christian Brothers Univ.*, Docket No. 96-4-SP, U.S. Dep't of Educ. (Jan. 8, 1997) at 1.

[14] To the extent that FSA challenges whether the estimated loss formula should be used, I have determined that it is appropriate to employ the formula to calculate the amount owed by Decker for the liabilities incurred in Finding 3. This Tribunal has repeatedly "favored use of the estimated loss formula to calculate FFEL liability." Id. at 3. Because the role of this Tribunal is to "determine the loss suffered by ED so as to fully compensate it, but not to enrich it," we have repeatedly used the estimated loss formula "as a fair and accurate assessment of liability." *In re Bryant & Stratton Bus. Inst.*, Docket No. 94-190-SA, U.S. Dep't of Educ. (Sept. 16, 1996) at 4 (further quotations omitted).

[15] *In re Bryant & Stratton Bus. Inst.*, Docket No. 94-190-SA, U.S. Dep't of Educ. (Sept. 16, 1996) at 4.

estimated loan subsidies and interest payments made by the Department to yield the estimated loss formula liability."[16]

The Institutional Reviewed Data Sheet, at the front of the FPRD, indicates that the applicable final cohort default rate is the 2003 cohort default rate of 2.7%. Decker argues this is the rate that should be applied, as it is the last published cohort default rate. Decker contends that the 2.7% rate was published in the fall of 2005 for FY 2003 and was the last cohort default rate published for Decker. Decker, in the alternative, asserts that if we do not apply that rate, we should apply "the overall rate for the institutional sector." Specifically, Decker asserts that we should use the national 2-year cohort default rates for 2-year propriety institutions, namely 9.9% for FY 2004, 9.3% for FY 2005, and 11.1% for FY 2006. FSA argues that rather than the established cohort default rate of 2.7% or the national average, we should apply the "FY2006 Cohort Default Rate" of 65%,[17] which was calculated by FSA using the Decker student loans that went into default between October 1, 2005 and September 30, 2007. These calculations are set out in FSA's Exhibits 7 and 8. FSA argues that the rate they offer is more representative of the group of borrowers whose loans are at issue in Finding 3.

In *In re Christian Brothers*, the Department stated that in that case, and in "any future case, it will use the rates applicable to the period under review, if final, or, if not, the most recent cohort default rate."[18] As Decker noted, the last published cohort default rate indicated on FSA's own Information for Financial Aid Professionals website is the FY 2003 rate of 2.7%.[19] So, for loans made during FY 2003, there is to be no reason to deviate from the Department's established practice. As we have noted in the past, where there is no published final cohort default rate for a year, the Department normally applies the fiscal year's national average cohort default rate for similar proprietary schools.[20] Again, we see no reason to deviate from established practices, and therefore, for payments made on loans during FY 2004, FY 2005, and FY 2006, the relevant national average cohort default rates should be applied.

FSA asserts we should use the cohort default rate it has calculated for FY 2006 because it is more representative of the actual loans at issue. As noted, however, there is no published FY 2006 cohort default rate for Decker. Rather, FSA's rate is a number it has calculated which has never been published. Further, there is no indication Decker was ever provided an opportunity to challenge the basis for this calculation. As noted by this Tribunal, "[t]he cohort default rate is a creature of statute—Congress has determined it to be a significant, meaningful measurement of the risk of loss in Title IV programs, 20 U.S.C. §§ 1085(a)(2) and (m)."[21] Part of the use of the cohort default rate has been that institutions are provided an opportunity to contest and correct

---

[16] *In re Chauffeur's Training School*, Docket No. 92-113-SA, U.S. Dep't of Educ. (Nov. 23, 1999) at 3; *see also In re Bryant & Stratton Bus. Inst.*, Docket No. 94-190-SA, U.S. Dep't of Educ. (Sept. 16, 1996) at 3.

[17] 65 % for 2006 is a much higher rate, and would be at least in part due to the fact that, at approximately the time that this FPRD was issued, Decker's financial status was changed away from pre-payment of Title IV funds. Soon after that, Decker closed and filed for bankruptcy, which may have led to the higher default rates.

[18] *In re Christian Brothers Univ.*, Docket No. 96-4-SP, U.S. Dep't of Educ. (Jan. 8, 1997) at 5.

[19] *See Archived Press Package*, Federal Student Aid, http://ifap.ed.gov/DefaultManagement/press/ (last visited Nov. 17, 2015)

[20] *See In re Tiger Welding Inst.*, Docket No. 97-39-SP, U.S. Dep't of Educ. (July 2, 1998) at 3.

[21] *In re Bryant & Stratton Bus. Inst.*, Docket No. 94-190-SA, U.S. Dep't of Educ. (Sept. 16, 1996) at 4.

the basis for a cohort default rate calculation before it is used. By it very language, the statute creating the cohort default rate requires that institutions be provided an opportunity "to review and correct errors in the information required to be provided to the Secretary" before the calculation of the rate.[22] And before a cohort default rate can be used as a basis for terminating an institution's eligibility for participation in federal loans, the institution must be given 30 days to appeal the loss of eligibility.[23] And in those matters, only a final cohort default rate may be used as the basis for a termination of eligibility.[24] Although the cohort default rate is being used in the present matter to calculate the amount of money Decker is required to repay in a Subpart H proceeding rather than determining whether to terminate Decker's eligibility for Title IV money in a Subpart G proceeding, the same considerations are present. There is no indication that Decker has ever been given an opportunity to challenge the calculation of FSA's proposed rate or that FSA's proposed rate is a final published rate. FSA's proposed unpublished rate, therefore, cannot be used as a basis for calculating Decker's repayment liability.

Therefore, for the liability remaining under Finding 3, FSA shall calculate the amount of money required to be refunded applying the 2.7% cohort rate to loans improperly paid out during the FY 2003 period and the relevant national average rate for loans improperly paid out in subsequent years. Additionally, when presenting to Decker the amount required to be returned, FSA will provide to Decker and the Department the calculations used to reach the Department's calculated amount.

## ORDER

For Finding 1, because the weight of the evidence is that Decker was properly accredited, I order that Finding 1 and its related liability for Decker of $31,595,885 must be set aside.

For Finding 2, because Decker has partially met its burden of proof, I order FSA to reduce the original $3,291,759 liability by removing the liability amounts imposed on the students documented in spreadsheets A and B.

For Findings 3 and 4, because Decker concedes liability for students who received FFEL loan or Pell Grant payments prior to the completion of the fifteenth week who did not then continue on after the fifteenth week, I order FSA's liability determination for those students be affirmed. For Findings 3 and 4, because Decker is not liable for funds dispersed to students who completed 15 weeks of the program but had not completed 18 credits of work, I order the liability for those students set aside. Further, for Finding 3, because the 2.7 cohort default rate applies to the liability for loans improperly paid out during the FY 2003 period and the relevant national average rate applies for loans improperly paid out in subsequent years, I order FSA to recalculate Finding 3 for the liability identified in this decision by applying the correct cohort

---

[22] 20 U.S.C. § 1085(m)(1)(A).

[23] 20 U.S.C. § 1085(a)(1).

[24] *In re Westchester Sch. of Beauty Cult.*, Docket No. 94-190-SA, U.S. Dep't of Educ. (Dec. of Sec. Sept. 16, 1996) at 3-4 & n.3; *In re Aladdin Beauty College*, Docket No. 97-109-ST, U.S. Dep't of Educ. (July 1, 1998) at 2; and *In re Joe Louis Sch. of Beauty*, Docket No. 96-108-SA & 97-19-ST, U.S. Dep't of Educ. (Dec. of Sec. Nov. 17, 1999) at 5, 6.

default rates. Additionally, since the information in this file cannot provide a way to ascertain the resulting figures, FSA shall perform the recalculations ordered in this decision. When presenting to Decker the amount required to be returned, FSA will provide the calculations used to reach the Departments determination of liability.[25]

For Finding 5, because Decker's program had an established term using credits and not clock hours, I order the liability for Finding 5 be set aside.

For Finding 6, Decker has agreed that this tribunal lacks subject matter jurisdiction over Finding 6 since it does not involve a monetary repayment liability.

Robert G. Layton
Judge

Dated: March 15, 2016

[25] It is possible further appeals beyond the jurisdiction of this decision will be pursued. Once this decision is issued I have no authority to order subsequent actions. However, due to the extremely long history of this dispute, I do have offer an observation on one way to insure a full and fair record is generated while the necessary documents are still available: Whatever further appeals are required, if FSA were to proceed with the calculations referred to in this order, it would insure the figures are calculated while the full administrative record from the previous level remains available. Such calculations would not hold appeals in abeyance, and would be contingent until all appeals are resolved, but could be potentially much more challenging if an additional period of time were allowed to pass during the appeal process.

SERVICE

A copy of this order was sent to:

Steven Finley, Esq.
400 Maryland Ave., S.W., Room 6E113
Washington, DC 20202-2110
Steve.finley@ed.gov

David E. Mills, Esq.
Joseph J. Vaughan, Esq.
Cooley, LLP
1299 Pennsylvania Avenue NW,
Suite 700
Washington, DC 20004-2400
dmills@cooley.com
jvaughan@cooley.com

Peter D. Coffman, Esq.
Thompson Hine
Two Alliance Center
3560 Lenox Road NE
Suite 1600
Atlanta, GA 30326
Peter.coffman@thompsonhine.com