# EXHIBIT G



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

*In the matter of*

**THE ESTATE OF DECKER COLLEGE,**

Respondent.

Docket No. 21-02-SA

Federal Student Aid Proceeding

CAN: 04-2005-52005

## DECISION OF THE SECRETARY

The Estate of Decker College (Decker) and Federal Student Aid (FSA) have each appealed aspects of Administrative Law Judge (ALJ) Elizabeth Figueroa's decision in the above-captioned case. The ALJ considered findings in FSA's Final Audit Determination (FAD) and associated financial liabilities. Based on Decker's failure to submit a close-out audit, the ALJ upheld $16,408,375.83 in "Federal Pell Grant Liabilities for the Unaudited Period" and $20,736.00 for "Liabilities for Unsubstantiated Excess Cash DL for the Unaccounted Period and Prior Award Years."[1] Decker appeals this portion of the decision. Based on FSA's failure to make a prima facie case, the ALJ declined to uphold $6,896,759.00 for "Liabilities for Closed School Loan Discharges."[2] FSA appeals this portion of the decision.

The question presented is whether the ALJ erred in the analysis leading to upholding or declining to uphold each category of liabilities described above. Based on the following analysis, I find that the ALJ's opinion is well-supported and well-reasoned. Accordingly, I will affirm the Decision as described below.

*Applicable Law*

Institutions of higher education may voluntarily participate in Title IV student financial aid programs. As part of commencing such participation, an institution signs a program participation agreement (PPA). By signing the PPA, the institution agrees to comply with all legal requirements of the Title IV program and enters into the role of a fiduciary for

---

[1] Decision at 1.
[2] *Id.* The ALJ also declined to uphold $214,933.71 for Loan Liabilities for the Unaudited Period based on FSA's use of an incorrect cohort default rate in its estimated loss formula. *Id.* at 17–18. The ALJ indicated that this liability should be recalculated by FSA. FSA does not appeal this finding, so I will not discuss it further in this decision.

administering federal funds.³ Among other things, the institution agrees to establish and maintain records necessary for determining student eligibility to participate in Title IV. The institution must also be able to determine the amount of Title IV funds a student has earned as of the date of an early withdrawal from the institution. When an institution has a policy that attendance must be taken, the institution must maintain attendance records and use those records to determine whether a student has withdrawn.⁴ Finally, the institution agrees to generally meet the administrative requirements at 34 C.F.R. § 668.16 and to handle the Title IV funds with the highest standard of care and diligence as a fiduciary under 34 C.F.R. § 668.82.

Institutions are required to verify student information to establish eligibility for Title IV funds prior to disbursements.⁵ Institutions are required to cooperate with FSA in periodic program reviews and provide records or other evidence demonstrating the institutions' compliance with Title IV requirements.⁶

*Factual Background*

Founded in 1989 and accredited by the Council on Occupational Education (COE) in 1992, Decker was a private two-year career institution of higher education.⁷ Decker participated in Title IV programs under a program participation agreement.⁸

In 2005, FSA conducted a program review of Decker's compliance in the 2003–2004 and 2004–2005 award years.⁹ In June 2005, FSA placed Decker on Heightened Cash Monitoring 2 (HCM2).¹⁰ On September 30, 2005, FSA denied Decker's re-certification for Title IV programs.¹¹ Therefore, Decker's Title IV eligibility terminated in September 2005, and Decker ceased operating as an educational institution upon its bankruptcy in October 2005.¹² The bankruptcy case was filed in the United States Bankruptcy Court for the Western District of Kentucky.¹³

On November 9, 2005, FSA notified the Bankruptcy Trustee that Decker must submit a close-out audit, but Decker did not do so within 90 days of the end of its Title IV participation, or at any time thereafter.¹⁴

---

³ *Prof'l. Career Training Inst. (TX)*, Dkt. No. 19-55-ST, U.S. Dep't of Educ. (Decision of the Secretary) (Dec. 3, 2021) at 1 (citing 34 C.F.R. § 668.14; *see generally* 34 C.F.R. Part 668 Subpart B – Standards for Participation in Title IV, HEA Programs.).
⁴ *See Atlanta Beauty & Barber Acad.*, Dkt. No. 17-55-SP, U.S. Dep't of Educ. (Apr. 12, 2021) at 3–4.
⁵ *Bellefonte Acad. of Beauty*, Dkt. No. 17-28-SP, U.S. Dep't of Educ. (Decision of the Secretary) (Nov. 2, 2020) at 3.
⁶ *Bramson ORT Coll.*, Dkt. No. 18-08-SP, U.S. Dep't of Educ. (Decision of the Secretary) (Oct. 15, 2021) at 2.
⁷ Decision at 5.
⁸ *Id.*
⁹ *Id.* at 5–6.
¹⁰ *Id.* at 6.
¹¹ *Id.*
¹² *Id.*; Brief of Decker College on Appeal to the Secretary of Education (Decker Brief) at 2.
¹³ Decision at 6.
¹⁴ *Id.*

2

On March 31, 2006, FSA issued a Final Program Review Determination (FPRD) making various findings.[15] Decker filed an appeal of the FPRD, and the Office of Hearings and Appeals (OHA) docketed the matter as case number 06-22-SP.[16] At this time, Decker alleged that COE's statements to FSA concerning its accreditation erroneously resulted in FSA terminating Decker's Title IV eligibility and the resulting bankruptcy. OHA stayed the administrative appeal pending a ruling from the bankruptcy court concerning Decker's accreditation.[17]

In October 2006, Decker sought authorization from the bankruptcy court to conduct a close-out audit, but in August 2007 the auditor withdrew from its engagement, stating the records it received were too incomplete to conduct the audit.[18]

In July 2012, the bankruptcy court ruled in Decker's favor on the issue regarding COE's statements. That ruling was upheld on appeal.[19]

In February 2015, OHA lifted the stay of 06-22-SP. On March 15, 2016, ALJ Robert Layton issued a decision in 06-22-SP, which was upheld on appeal by the Secretary.[20]

In May 2017, Decker and COE settled pending litigation regarding COE's role in Decker losing its accreditation.[21]

In 2019 and 2020, the Bankruptcy Trustee, FSA, and Decker took steps to engage an auditor to conduct a close-out audit. However, the audit was not completed.[22]

On November 16, 2020, FSA issued the FAD concluding that Decker failed to submit a close-out audit for the period of July 1, 2004, to September 30, 2005.[23] Because Decker failed to submit the close-out audit, FSA found Decker "liable for all the Title IV funds received during the unaudited period."[24] FSA asserted Decker accrued an aggregated liability of $23,540,804.54. This amount is divided among $16,408,375.83 for Federal Pell Grants from the unaudited period, $44,299.19 for estimated loss from Direct Loan liabilities, $170,634.52 for the Department's estimated loss for excess subsidies paid to lenders for ineligible loans extended under the Federal Family Education Loan Program, $6,896,759.00 for Closed School Loan Discharges, and $20,736.00 for unsubstantiated Excess Cash Direct Loan program funds.[25]

The FAD's support for the closed school loan discharge liability was limited to a reference to Appendix D.[26] Appendix D is a 24-page spreadsheet listing data for thousands of

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.* at 7.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.* at 8–9.
[23] Decker Brief, Ex. R-3 (Final Audit Determination) at 0010.
[24] *Id.*
[25] Decision at 8.
[26] *Id.* at 19.

3

former Decker students. It contains no qualitative analysis connecting the data to the rules applicable for closed school loan discharges.[27]

Decker appealed the FAD and, ultimately, the ALJ issued the decision now under appeal by both Decker and FSA.

*Burden of Proof*

In an appeal under 34 C.F.R. Part 668 Subpart H (Appeal Procedures for Audit Determinations and Program Review Determination), FSA must first make a prima facie case, providing sufficient evidence that a violation occurred.[28] Then, the institution bears the burden of showing, by a preponderance of the evidence, that all expenditures were proper and that the institution complied with program requirements.[29] In a subsequent appeal before the Secretary, the appealing party bears the burden of demonstrating, with a preponderance of the evidence, that the hearing official erred in his or her findings.[30]

In this analysis I will first consider Decker's appeal and second consider FSA's appeal.

*Decker's Appeal*

Decker has appealed the portion of the ALJ's decision finding Decker liable for $16,408,375.83 in Federal Pell Grant Liabilities for the Unaudited Period and $20,736.00 for Liabilities for Unsubstantiated Excess Cash DL for the Unaccounted Period and Prior Award years.

An institution that ends Title IV participation must submit an engagement letter for an independent audit for all funds received under the program within 45 days after participation ends, then must submit the audit within 45 days of the date of the engagement letter.[31] The regulation in effect in 2005 is cited below in relevant part:

> (b) If an institution's participation in a Title IV, HEA program ends, the institution shall—
>
> > (1) Immediately notify the Secretary of that fact;
> >
> > (2) Submit to the Secretary within 45 days after the date that the participation ends—
> >
> > > (i) All financial, performance, and other reports required by appropriate Title IV, HEA program regulations; and

---

[27] *Id.*
[28] *City Univ. of NY Lehman Coll.*, Dkt. No. 18-38-SP, U.S. Dep't of Educ. (Apr. 22, 2020) at 14.
[29] *Bramson ORT Coll.*, Dkt. No. 18-08-SP, U.S. Dep't of Educ. (Decision of the Secretary) (Oct. 15, 2021) at 3 (citing 34 C.F.R. § 668.116(d)).
[30] *Id.* (citing *Central State Univ.*, Dkt. No. 12-32-SA, U.S. Dep't of Educ. (Decision of the Secretary) (Sept. 2, 2014) at 1).
[31] 34 C.F.R. § 668.26(b)(2).

4

> (ii) A letter of engagement for an independent audit of all funds that the institution received under that program, the report of which shall be submitted to the Secretary within 45 days after the date of the engagement letter;
>
> (3) Inform the Secretary of the arrangements that the institution has made for the proper retention and storage for a minimum of three years of all records concerning the administration of that program;
>
> ...[32]

In past decisions of the Department, where an institution failed to submit a close-out audit, the Department found that institution liable for 100% of the unaudited funds.[33] ED informed Decker in November 2005 that it would be liable if it did not submit an audit in 90 days.[34] However, the findings in the FPRD did not include the failure to submit a close-out audit, and FSA apparently did not make any other determination of liability based on Decker's failure prior to 2020. Finally, on November 16, 2020, FSA issued the FAD now under appeal.

In the Decision, the ALJ found that "Decker does not challenge the conclusion that it failed to file a close-out audit following the end of its participation in Title IV," but considered several arguments as to why the liability in the FAD should not be upheld.[35] The ALJ ultimately rejected these arguments and upheld the associated liability.

In the instant appeal, Decker does not assert it filed a timely close-out audit.[36] Instead, Decker again argues the ALJ allegedly erred by not reducing or eliminating its liability. I consider these arguments below.

1. Whether All Funds from the Unaudited Period Have Been Accounted For

Decker asserts that it should not be liable because the unaudited funds that would have been accounted for in a close-out audit were accounted for elsewhere. Specifically, Decker asserts that FSA's program review took the place of a close-out audit. While a close-out audit would be conducted by a certified public accountant (CPA) testing a sample of records, "a program review tests compliance with the same rules as the close-out audit and subjects a school to a higher level of scrutiny than an audit conducted by a CPA."[37] Decker asserts that a close-out review can be satisfied by processes that otherwise account for funds and "[t]here is no substitute process more appropriate for a close-out audit than a federal program review."[38] Decker asserts that the ALJ erred by not recognizing that a program review is more expansive

---

[32] 34 C.F.R. § 668.26 (2005).
[33] Decision at 9 (and cased cited).
[34] *Id.*
[35] *Id.*
[36] Decker Brief at 9.
[37] *Id.* at 8.
[38] *Id.*

5

than a close-out audit and should, therefore, fully overlap and take the place of a close-out audit.[39]

FSA counters that the requirement to conduct a close-out audit of all unaudited federal student aid funds is mandatory without "any exception, substitute or alternative."[40] While preparation of a close-out audit is mandatory, the ALJ noted that liability may not be assessed where "other evidence may satisfy, in whole or in part, the evidentiary burden of showing aid was properly disbursed."[41] Therefore, even in the absence of a close-out audit, Decker's liability may be reduced if adequate evidence exists of proper distribution of funds during the unaudited period.

In the Decision, the ALJ considered what types of information might reduce or eliminate liabilities by providing an alternative accounting instead of an actual close-out audit. The ALJ enumerated the areas covered by the FPRD and also considered whether the FPRD adequately covered the items that would be included in the CPA engagement for the close-out audit.[42] The ALJ concluded the FPRD "did not account fully for Decker's expenditure of Title IV funds."[43] In that same vein, FSA argues the FPRD is an inadequate substitute for the close-out audit because "the program review was more focused and did not encompass the scope of the unaudited federal student aid funds that Decker was required to account for in its close-out audit."[44]

I agree with FSA, finding that the ALJ sufficiently considered and rejected Decker's assertion that the existence of the program review relieved Decker of the obligation to conduct a close-out audit. The issue is not whether a program review *could* provide an alternative accounting of funds in an unaudited period. The question is whether the program review in this case *actually provides* such alternative accounting. The copy of the FPRD filed as an exhibit in this appeal by Decker includes lists of students with accompanying figures for Title IV disbursements. It does not show enrollment or disbursement dates or provide the kind of qualitative analysis an audit would include. For example, the documents attached to the FPRD do not provide any analysis as to whether any of the student records contained errors or whether any of the funds were distributed to ineligible students during the unaudited period.

Decker's argument relies on the theory that if a hypothetical program review could be an alternative accounting, Decker should be relieved of conducting a close-out audit because a program review occurred in this case. FSA has the authority in the course of a program review to request and compile the information needed for a close-out audit. If the program review had generated a report including all the data necessary for a close-out audit, Decker could have

---

[39] *Id.* at 6.
[40] Reply Brief on Appeal for Federal Student Aid (FSA Reply) at 4 (quoting Decision at 8 and 34 C.F.R. § 668.26).
[41] Decision at 10.
[42] *Id.* at 12. Decker asserts the ALJ erred in this enumeration because the ALJ described the subjects of unresolved findings while the program review actually covered more aspects of Decker's operations, including "broad questions of eligibility and administrative capability." Decker Brief at 7. However, as discussed *supra*, the ALJ's enumeration is relevant because these are the areas for which FSA's program review resulted in the most substantial analysis of collected data.
[43] Decision at 12.
[44] FSA Reply at 5–6 (citing Decision at 12).

already submitted that report prior to this appeal or as evidence in this appeal. No such report is in the record, and apparently no such report exists. It is likely that program reviews were conducted in every past case before the Department where failure to submit close-out audits resulted in 100% liability for the unaudited periods. Regardless of how "complex and comprehensive" a program review might be, FSA is not obligated to establish a report that would substitute for a close-out audit when conducting every program review. I find the ALJ well justified in not treating the FPRD in this case as a substitute for a close-out audit.

Decker sought permission to conduct a close-out audit in October 2006. The Bankruptcy Trustee also attempted to engage an auditor for a close-out audit in 2019 and 2020. The procedural history of this case indicates that Decker recognized its obligation to complete a close-out audit up to the time when FSA issued the FAD. Only on appeal has Decker sought to avoid liability by claiming FSA could have prepared an alternative accounting in its program review. However, because no alternative accounting actually exists, Decker has failed to establish that the ALJ erred by upholding liability based on a failure to submit the required close-out audit.

   2. Whether Liability is Barred by Laches

Alternatively, Decker argues that the ALJ erred by failing to apply the equitable defense of laches to the liability in this case.[45] "Laches is an equitable doctrine that prevents a party from pursuing a right or claim after an unreasonable delay that prejudices the party against whom relief is sought."[46] Generally, laches does not apply to government action enforcing a public right or to protect a public interest.[47] In narrow cases, the Department has found laches to apply to Final Audit Determinations.[48] More recently, a decision by then-Acting Secretary Mitchell M. Zais held that laches does not apply to the Department's program reviews and audit determinations.[49] However, that holding ignored the analysis in the cited authority which acknowledged that the Department "has a history of allowing *laches* to be asserted as an equitable defense in Subpart H administrative proceedings."[50] I find that the ALJ correctly undertook an analysis of whether laches would apply in the instant case.

In weighing the applicability of laches, the mere passage of time does not constitute an unreasonable delay.[51] Rather, an institution arguing that FSA's delay in taking action should extinguish liability must show how FSA's failure to act was "unreasonable, unexplained or prejudicial" and how it hindered the institution's ability to respond to the government action.[52] Where an institution "was aware at all relevant times that it was the subject of a program review

---

[45] Decker Brief at 10.
[46] *Bramson ORT Coll.*, Dkt. No. 18-08-SP at 5.
[47] *Id.* (citing *U.S. Immigration and Naturalization Serv. v. Hibi*, 414 U.S. 5, 8 (1973) and cases cited).
[48] *See* Decision at 15 (and cases cited).
[49] *The Hair Cal. Beauty Acad.*, Dkt. No. 18-13-SP, U.S. Dep't of Educ. (Decision of the Secretary) (Jan. 15, 2021) at 5 (citing *Comm. Coll. Sys. of N.H.*, Dkt. No 09-35-SA, U.S. Dep't of Educ. (Jun. 21, 2010)).
[50] *Comm. Coll. Sys. of N.H.*, Dkt. No 09-35-SA at 3.
[51] *The Hair Cal. Beauty Acad.*, Dkt. No. 18-13-SP at 5.
[52] *Id.* ((citing *Inst. of Med. Educ.*, Dkt. Nos. 12-59-SA, 1-58-SP, U.S. Dep't of Educ. (Decision of the Secretary) (Aug. 18, 2014) at 5).

7

and knew to retain appropriate records" the institution's argument that it should be relieved of liability failed.[53]

Decker argues that FSA inexcusably chose to delay issuing the FAD and its liability determination for 15 years, even though the liability attached when Decker initially failed to provide a closeout audit, prior to issuance of the FPRD.[54] Although Decker and FSA stipulated to stay the original administrative appeal regarding the FPRD, Decker asserts this stay and the resulting passage of time was instigated by FSA's insistence.[55] Furthermore, Decker asserts the passage of time has prejudiced it, because Decker has expended its resources in legal defense and now lacks access to the records and personnel it needs to defend itself in this proceeding.[56]

In the Decision, the ALJ recognized the length of time that passed and the protracted nature of the related litigation with regard to the facts underlying this case.[57] The ALJ noted that Decker closed in October 2005, and FSA issued the FPRD in 2006 after which Decker filed its appeal of the FPRD.[58] Subsequent delays through at least November 2016 resulted from the administrative appeal remaining stayed during proceedings before the Bankruptcy Court and the ensuing resolution of both the administrative appeal and the appeal of the resulting decision to the Secretary.[59] Thereafter, the bankruptcy proceeding remained pending.[60] Based on this procedural history, the ALJ found that the passage of time was not due to negligence on the part of the government.

The ALJ also found that Decker was not unduly prejudiced by the passage of time. "Decker was on continuing notice of potential liabilities, the need to maintain adequate records for an audit, the requirement to provide a close-out audit, and the eventuality of issuance of a Final Audit Determination" since Decker began participating in Title IV programs.[61]

I agree with the ALJ's findings and am not persuaded the ALJ erred in applying the test established in past departmental cases. First, the protracted nature of Decker's controversy from the very beginning demonstrates that the government did not engage in unreasonable delay. FSA issued the FPRD in a reasonable amount of time following the program review and Decker's subsequent closure. After the parties agreed to stay the appeal of the FPRD, FSA acted reasonably by not issuing a FAD that may have confused the very issue of overlapping jurisdiction – between FSA, OHA, and the court – which the parties sought to avoid by implementing a stay. Nevertheless, Decker did not need to receive a FAD to know it already had an obligation to provide a close-out audit. Decker was aware of its obligation to perform a close-out audit in the event of closure under the terms of participation in Title IV programs. FSA's issuance of a FAD many years later is not a surprise claim of the kind that laches seeks to prevent. Decker knew the close-out audit requirement triggered upon closure in October 2005

---

[53] Id. at 5.
[54] Decker Brief at 10–11.
[55] Id. at 11.
[56] Id. at 12.
[57] Decision at 16.
[58] Id.
[59] Id.
[60] Id.
[61] Id.

8

with or without affirmative notification from FSA. Decker was on notice from the beginning of this controversy, especially in light of the ongoing litigation, that it had an obligation to retain all records that would be necessary to complete a close-out audit or defend against liability cited in a future FAD.[62] Therefore, I find neither an unreasonable delay on the part of the government nor prejudice against Decker's ability to respond to the FAD regarding both the close-out audit and the $20,736 liability for unsubstantiated excess cash.

Based on the foregoing analysis, I uphold the ALJ's findings appealed by Decker. I now turn to the portion of the Decision appealed by FSA.

*FSA's Appeal*

FSA has appealed the portion of the ALJ's decision in which the ALJ declined to uphold $6,896,759.00 for "Liabilities for Closed School Loan Discharges."[63]

At the time relevant to the facts of this case, closed school loan discharges applied to students who were in attendance at the time the school closed or who "withdrew from the school not more than 90 days prior to the date the school closed."[64] Such students had the loan discharged and assigned to the Department the right to recover liabilities from the institution up to the amount discharged.

The ALJ found that the FAD "summarily states that Decker owes the Department $6,896,759.00" based on Appendix D: twenty-four pages of spreadsheets showing student loan data. However, the appendix does not demonstrate whether any of these students should have received closed school loan discharges based on Decker's closure date sometime in October of 2005.[65] The ALJ found that the "Enrollment End Dates" listed in the appendix either demonstrate these students were *not* eligible for such discharges, because their enrollment ended between April of 2003 and early 2005, or that the appendix is entirely silent on the students' withdrawal dates.[66] The ALJ found the evidence supporting closed school loan discharges to be so insufficient as to prevent even the drawing of an inference as to which students' withdrawals occurred within the 90-day window permitting a closed school loan discharge.[67] Based on this finding, the ALJ held that FSA failed to make a prima facie case for the $6,896,759.00 liability for closed school loan discharges.[68]

On appeal, FSA argues that the ALJ erred because the information provided in Appendix D was sufficient "to shift the burden of proof to the institution."[69] FSA asserts that the approximately 2,650 students listed in the appendix obtained closed school loan discharges by, among other things, providing "sworn statements that they were in attendance during the qualifying time period and that they did not complete their programs of study at another

---

[62] *The Hair Cal. Beauty Acad.*, Dkt. No. 18-13-SP at 5.
[63] FAD at 3.
[64] 34 C.F.R. § 682.402(d) (2005).
[65] Decision at 19.
[66] *Id.*
[67] *Id.* at 20.
[68] *Id.*
[69] Brief on Appeal to the Secretary for Federal Student Aid (FSA Brief) at 4.

9

institution."[70] It is unclear whether FSA obtained any documentation from students corroborating these statements, as FSA asserts the "statements conclusively established the dates of withdrawal and discharge eligibility."[71] FSA goes on to assert that Appendix D constitutes "evidence that when considered alone would lead the factfinder to the inference that a violation occurred."[72] Finally, FSA posits that "[t]o the extent the July 6 Initial Decision noted that some information in Appendix D may have been at odds with the closed school discharge requirements related to the students' last day of attendance or other eligibility criteria, it is Decker's burden to challenge those on a student-by-student basis . . . ."[73]

In response, Decker asserts that Appendix D is insufficient to establish a prima facie case because it contains no explanatory key, no evidence to support the included data, and no analysis showing that the data listed qualified any given student for a closed school loan discharge.[74] Most of all, Decker noted that FSA's claim that it met its burden to establish a prima facie case based on sworn statements from students is presented in this case for the first time.[75]

The fatal flaw in FSA's argument is that it claims to have met an evidentiary burden by possessing, but not disclosing in its report, the evidence that would support the inference of a violation. If FSA had provided the student certifications as an exhibit of the FAD, the ALJ could have considered whether their contents satisfied FSA's burden to make a prima facie case. FSA claims the student certifications "conclusively" established the students' eligibility for discharges and therefore the liability, but without presentation of this evidence, they established nothing. Instead, FSA presented Appendix D, which the ALJ found insufficient to establish the claimed liability. In the instant appeal, FSA has not provided these sworn statements or any supporting evidence to refute the ALJ's holding.

Depending upon what information is contained in them, such as specific withdrawal dates and some analysis tying those dates to a school's closure date, student certifications alone may be sufficient to establish a prima facie case for this kind of liability. What is troubling in this matter is that the evidence that *was* included in Appendix D seems to support a finding that many students were *not* eligible for closed school loan discharges. If FSA were to produce certifications contradicted by other evidence in the record, FSA would not establish a prima facie case that Decker was liable for closed school loan discharges for those specific students. A student certification does not create the inference required to make a prima facie case if it is expressly refuted by other evidence presented in FSA's own findings. FSA attempts to elevate form over substance when it asserts that the existence of student certifications shifted the evidentiary burden to Decker such that Decker must "challenge . . . on a student-by-student basis" the data in Appendix D that "may have been at odds with the closed school discharge requirements."[76] In effect, FSA is asserting that it should benefit from a presumption of

---

[70] FSA Brief at 3, 5.
[71] *Id.* at 5.
[72] *Id.* at 7 (quoting *Sinclair Cmty. Coll.*, Dkt. No. 89-21-S, U.S. Dep't of Educ. (Decision of the Secretary) (Sept. 26, 1991) at 5).
[73] *Id.* at 8.
[74] Reply Brief of Decker College on Appeal to the Secretary of Education at 3.
[75] *Id.*
[76] FSA Brief at 8.

10

regularity afforded to government agencies despite the presence of evidence that would rebut that presumption presented in its own findings.

I am convinced that the ALJ correctly assessed the factual weakness of FSA's case regarding closed school loan discharges in the FAD. FSA failed to make a prima facie case regarding this liability upon issuing the FAD and has failed to show any error in the ALJ's decision. Based on this analysis, I will uphold the ALJ's findings appealed by FSA.

## **ORDER**

ACCORDINGLY, the ALJ's Decision is affirmed.

So ordered this 7th day of June 2024.

Miguel A. Cardona, Ed.D.
U.S. Secretary of Education

Washington, D.C.

## Service List

Jay Vaughan
Cooley LLP
1299 Pennsylvania Ave., N.W.
Suite 700
Washington, D.C. 20004-2400
jvaughan@cooley.com

Denise Morelli, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave., S.W., 6E206
Washington, D.C. 20202
Denise.Morelli@ed.gov